Steven M. COBIN, Trustee of The Cobin Family Trust, Harold J. Belkin, Trustee of The Belkin Family Trust and Marsha Hendler, Plaintiffs,

v.

Donald G. RICE, Jr., Defendant.

Civ. No. F 91–86.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 5, 1993.

John F. Lyons, Alan Ver Planck, Fort Wayne, IN, for plaintiffs.

Robert Owen Vegeler, Beers, Mallers, Backs & Salin, Fort Wayne, IN, for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on four motions for partial summary judgment filed by the plaintiffs, on a motion to strike affidavit, also filed by the plaintiffs, and on a cross-motion for partial summary judgment filed by the defendant.

### Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 477 U.S. at 252, 106 S.Ct. at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High School District No. 204*, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact, *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand sum-

mary judgment. *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.*, 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

*A. Motion for Partial Summary Judgment Declaring Oaklawn Partnership Dissolved [1]*

The Oaklawn Courts Partnership ("the Partnership") operates an apartment com-

plex in Fort Wayne, Indiana. The real estate is commonly known as "Oaklawn Courts Apartments" ("Oaklawn Courts"), and consists of approximately 330 apartments. The Partnership was formed under the laws of the State of California on February 21, 1985 between plaintiff Cobin, Trustee of the Cobin Family Trust, plaintiff Belkin, Trustee of the Belkin Family Trust and defendant Rice. Plaintiff Hendler has an interest in the Partnership by reason of her former marriage to Belkin.

The principal capitalization of Oaklawn Courts came via the creditworthiness of Cobin and Belkin. The initial assets of the Partnership were acquired through interim financing. The interim financing was procured through Merchants National Bank and Trust Company ("Merchants"). Merchants demanded and received personal guarantees from each of the partners, including Rice. Cobin was designated as the managing partner of the Partnership and Rice was designated as the property manager of Oaklawn Courts.

In March of 1987, the principals of the Partnership entered into a financing arrangement with Merchants. This financing arrangement expired on April 1, 1990. After the expiration of the financing arrangement, the Partnership continued to pay Merchants the same amount per month as it had been paying prior to the expiration of the financing arrangement, together with taxes and insurance on the subject property.

On or about January 4, 1991, Merchants informed the principals of the Partnership that it would require a renewal of the previously expired loan, as well as personal guarantees from each of the partners in order to extend further credit and to renew the obligations existing between the Partnership and Merchants. On January 21, 1991, pursuant to written agreement of those partners of the Partnership holding at least fifty-one percent

---

**1.** The following factual background is derived from the plaintiffs' brief in support of their motion for partial summary judgment and the accompanying exhibits. Defendant has filed a cryptic response stating that the facts as present-

ed in plaintiffs' brief "are substantially accurate in part." However, as defendant has failed to indicate which facts he believes are not entirely accurate, the court assumes the facts as presented by the plaintiffs are true.

interest, it was determined that the renewal of the mortgage indebtedness was necessary in order to continue the ongoing operations of the Partnership, and that the current capital of the Partnership was insufficient for that purpose. Pursuant to paragraph 7 of the Partnership Agreement[2], each partner was asked to make a cash contribution either in cash or in the form of a clean letter of credit suitable for tender to Merchants for approval. This cash call was in the form of a written letter, dated January 21, 1991, from Attorney John Lyons to Messrs. Belkin, Cobin and Rice and Ms. Hendler.

In contravention of his obligations as a general partner of the Partnership, Rice refused to participate in the cash contribution either by submitting cash or a clean letter of credit. Rice also refused to lend any further credit to the business of the Partnership and also failed to meet his obligation to cover monthly ongoing operational shortfalls of Oaklawn. As a result, Merchants threatened to initiate foreclosure proceedings unless the remaining partners, the plaintiffs herein, came forward and assumed the full financial burden of refinancing the Partnership indebtedness. Plaintiffs Cobin, Belkin, and Hendler paid defendant Rice's one-third share of the refinancing obligation, in order to prevent foreclosure.

On April 11, 1991, the plaintiffs filed an action against Rice requesting that the court order dissolution of the Partnership, and order an accounting in order to wind up the business of the Partnership and to enable the plaintiffs to ascertain the exact nature and amount of damages due them from defendant. Plaintiffs further request that they be allowed to continue in the Partnership under the name and style "Oaklawn Courts Partnership," but without the participation of defendant Rice. Defendant filed a counterclaim on May 30, 1991 alleging, *inter alia,*

that the plaintiffs breached the Partnership Agreement in several respects. On August 12, 1991 this court granted Rice's motion to add causes of action and parties and on December 19, 1991, this court granted plaintiffs' motion to add causes of action and parties. Also on December 19, 1991, this court consolidated Civil Action No. F88–37, *Casselwood Partnership v. Donald G. Rice, Jr.,* with the present case. Plaintiffs filed the present motion for partial summary judgment on January 11, 1993, requesting summary judgment on their complaint.

In support of this motion, plaintiffs allege that Rice's actions in refusing to cooperate in the renewal of the Partnership's financing constitute wrongful material breaches of the Partnership Agreement, or at least constitute conduct that makes the continuation of the Partnership with Rice as a partner impracticable, thereby giving the plaintiffs a right to dissolution of the Partnership. Alternatively, plaintiffs claim that judicial dissolution of the Partnership is warranted because the relationship between the partners has deteriorated to the point that it is no longer feasible or possible to continue the business of the Partnership with Rice.

In response, Rice appears to believe that the evidence presented by the plaintiffs is sufficient for this court to rule in his favor as a matter of law. Rice alleges, without citing to any of the evidence before the court, that: (1) the current capital of the partnership was sufficient to continue the on-going operations of the partnership; (2) Rice did not wrongfully breach the Partnership Agreement in that the other partners had breached the Agreement resulting in Rice's refusal to participate; and (3) Rice was never contacted by either Merchant's or the other partners to participate in the refinancing.

---

2. Paragraph 7 of the Partnership Agreement provides as follows:

 7. *Additional Capital:* Whenever it is determined by the written agreement of those partners holding fifty-one percent (51%) interest that the capital of the partnership is, or is presently likely to become, insufficient for the conduct of its business, then, in that event, a call for a contribution of additional capital shall be made. Such a call shall be payable in cash thirty (30) days from the date of a written notice thereof. Each partner shall be liable to the partnership for such call in an amount equal to his interest in the partnership as set forth in paragraph 6. No partner may voluntarily increase his capital contribution except as provided in this paragraph or by written consent of the partners holding fifty-one percent (51%) interest.

■ The court has reviewed all of the evidence submitted by the plaintiffs in support of their motion for partial summary judgment. None of the proffered evidence supports any of the defendant's three contentions. Rather, the evidence clearly shows that Rice was made aware of the cash calls and refused to participate, in contravention of Paragraph 7 of the Partnership Agreement. Rice has not presented any evidence tending to show that the additional capital contributions were not needed, that Rice's refusal to participate was the result of some unspecified breach of the Partnership Agreement by the other partners, or that Rice was never aware of the cash calls.

By entering into the Partnership Agreement, plaintiffs Cobin and Belkin and defendant Rice expressed their desire to form a general partnership and agreed to become partners under the laws of the State of California. The applicable California law is the Uniform Partnership Act.[3] The Uniform Partnership Act defines "dissolution" as "the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Cal.Corp.Code § 15029 (1992). The Uniform Partnership Act provides that dissolution is caused by decree of the court under Section 15032. Cal.Corp.Code § 15031 (1992). Section 15032, in turn, provides that:

(1) On application by or for a partner the court shall decree a dissolution whenever:

(a) A partner has been declared a lunatic in any judicial proceeding or is shown to be of unsound mind,

(b) A partner becomes in any other way incapable of performing his part of the partnership contract,

(c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business,

(d) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him,

(e) The business of the partnership can only be carried on at a loss,

(f) Other circumstances render a dissolution equitable.

Plaintiffs first argue that this court should order dissolution of the Partnership pursuant to part (d) above as a result of Rice's willful or persistent breach of the Partnership Agreement, *i.e.*, Rice's failure to respond to the cash calls. Plaintiffs claim that this failure to respond to cash calls constituted a serious and unequivocal breach of the Partnership Agreement, in which case the misconduct itself actually dissolved the partnership, such that an order of dissolution by this court should be "retroactive" to the date of the breach. Plaintiffs cite *Vangel v. Vangel*, 116 Cal.App.2d 615, 254 P.2d 919, 926 (1953), wherein the California court held that:

It is, of course, clear that a court may, because of a breach of the partnership agreement, decree the dissolution of the partnership as of a date prior to the judgment. In some cases where the breach is serious and unequivocal the dissolution may be decreed as of the date of the breach. In such cases the misconduct really dissolves the partnership, the court decree merely giving legal effect thereto. But here the acts of Charles in excluding plaintiffs did not *ipso facto* dissolve the partnership. His acts simply provided grounds for an application to a court of equity for such relief. *Zeibak v. Nasser*, *supra*, 12 Cal.2d [1] at page 16, 82 P.2d [375] at pages 382, 383 [ (1938) ]. Upon having heard all the evidence the court properly concluded that the partnership could not go on and consequently had to decree its dissolution and fix a date upon which the respective interests of the partners would be determined. Here the court chose the date upon which the introduction of evidence was concluded. Such a date was entirely reasonable since the whole story of the controversy was before the

---

**3.** The California version of the Uniform Partnership Act, in all of its substantive provisions, is identical to the Indiana version.

court as of that time. See *Zeibak v. Nasser, supra,* 12 Cal.2d at 14–16, 82 P.2d at 381–383. Defendant is not prejudiced by fixing that date because, as we hereafter point out, he is still entitled to his pro rata share of the profits.

██ Plaintiffs argue that Paragraph 6 of the Partnership Agreement specifically and unambiguously provides that failure to make a capital contribution terminates the Partnership. Paragraph 6 provides as follows:

6. *Capital Contributions:* The partners initial capital contribution shall be paid, contributed, or transferred by the partners as indicated in Exhibit "A" and paid into the partnership by the date endorsed on said exhibit. The interests of the partners shall be directly proportioned to their initial capital contributions as indicated in Exhibit "A". Failure of a partner to contribute his capital as set forth herein shall terminate the partnership unless otherwise agreed to by all the remaining partners.

Plaintiffs argue that Rice's failure to respond to the cash calls constituted a serious and unequivocal breach of Paragraph 6. However, Paragraph 6 clearly applies only to *initial* capital contributions, and not to calls for *additional* capital contributions. Nonetheless, it is clear that Rice breached Paragraph 7 of the Partnership Agreement. Pursuant to Paragraph 7 of the Partnership Agreement, Rice agreed to contribute additional capital whenever partners holding fifty-one percent interest agreed that such additional capital was necessary to enable the Partnership to conduct business. Rice could not later refuse to abide by Paragraph 7 of the Partnership Agreement merely because he unilaterally believed additional capital was not needed, or because he felt that the partnership already owed him money. For this reason alone, the court finds that it is proper to dissolve the Partnership, pursuant to Section 15032(1)(d). However, there is no evidence to support plaintiffs' argument that Rice's conduct dissolved the Partnership at the time he breached the agreement. Like Charles' actions in *Vangel, supra,* Rice's actions in the present case simply provided grounds for an application to this court for dissolution of the partnership.

██ The court notes that even in the absence of an explicit breach of the Partnership Agreement, Rice's failure to contribute the necessary capital to the Partnership represents conduct which makes it not reasonably practicable for the plaintiffs to carry on the Partnership's business in partnership with Rice. Under California law, conduct of a partner which is injurious to the partnership constitutes a ground for judicial dissolution of the partnership. *Chatten v. Martell,* 166 Cal.App.2d 545, 333 P.2d 364, 368 (1958).

██ Additionally, the court finds that the Partnership should be dissolved pursuant to Section 15032(1)(f) of the Uniform Partnership Act. The plaintiffs have presented sufficient evidence of ill-will, dissension, and antagonism between the partners to prove that the partners are unable to carry on the Partnership business to their mutual advantage. Belkin's deposition testimony indicates that Rice was "operating in his own little vacuum", conducted the Partnership business as he wanted and made Partnership obligations without notifying the other partners, would not listen to or take directions from the other partners, and generally did not get along with the other partners. Rice admits that he has an "acrimonious" relationship with his partners, that the partners were at each other's throats, and that Rice encouraged his mother to file a lawsuit against Cobin, his partner, due to failed investments. (Cobin was then a stockbroker with Sutro.) Accordingly, as the Partnership business requires cooperation and harmony between the partners, which is clearly lacking, equitable dissolution of the Partnership is appropriate. See *Owen v. Cohen,* 19 Cal.2d 147, 119 P.2d 713, 715 (1941), where the court held that "courts of equity may order the dissolution of a partnership where there are quarrels and disagreements of such a nature and to such extent that all confidence and cooperation between the parties has been destroyed or where one of the parties by his misbehavior materially hinders a proper conduct of the partnership business." See also *Wallace v. Sinclair,* 114 Cal.App.2d 220, 250 P.2d 154 (1952).

██ In addition to an order of dissolution of the Oaklawn Courts Partnership, plaintiffs

request that, in order to permit them to proceed to an accounting and to accomplish those acts necessary for winding up the business, they be allowed to continue the operation of Oaklawn Courts pursuant to the provisions of California Corporation Code § 15037. Section 15037 provides as follows:

Unless otherwise agreed the partners who have not wrongfully dissolved the partnership or the legal representative of the last surviving partner, not bankrupt, has the right to wind up the partnership affairs; provided, however, that any partner, his legal representative, or his assignee, upon cause shown, may obtain winding up by the court.

The Partnership Agreement provides as follows:

27. *Dissolution of Partnership:* On any dissolution under this Agreement or applicable law, excepting as otherwise provided in this Agreement, the continuing operation of the partnership's business shall be confined to those activities reasonably necessary to wind up the partnership's affairs, discharge its obligations, and preserve and distribute its assets. Promptly on dissolution, a notice of dissolution shall be published under Section 15035.5 of the California Corporations Code, or any equivalent successor statute then applicable.

In accordance with § 15037 and Paragraph 27 of the Partnership Agreement, the court will permit the plaintiffs to continue the operation of Oaklawn Courts, but only to the extent necessary to wind up the partnership's affairs, discharge its obligations, and preserve and distribute its assets.

*B. Motion for Partial Summary Judgment as to Rice's Claims for Alleged Breaches of the Oaklawn Courts, McMillen Park, and Casselwood Partnership Agreements*

Plaintiffs have requested partial summary judgment as to all claims or counterclaims asserted by Rice alleging that the Cobin Family Trust, Steven M. Cobin, Trustee, the Belkin Family Trust, Harold J. Belkin, Trustee and/or Marsha Belkin, breached the Oaklawn Courts, McMillen Park, and Casselwood Partnership Agreements. Plaintiffs base their motion on the ground that as a matter of law Rice is not entitled to assert damage claims against the partners to these agreements.

Rice's counterclaim, filed on May 30, 1991, alleges that the plaintiffs have breached the Oaklawn Courts Partnership Agreement. Counts VIII, IX, and X of Rice's Additional Claims, filed on July 26, 1991, allege breaches of the Oaklawn, Casselwood, and McMillen Park Partnership Agreements. Rice has requested that the court award reasonable damages to be determined by the trier of fact, and to order an accounting and to enforce the agreements and make Rice a partner.

The plaintiffs dispute that Rice was ever a partner of the Casselwood or McMillen Park Partnerships, but admit that he was a partner in the Oaklawn Courts Partnership. However, plaintiffs argue that, even assuming Rice was a partner of all three partnerships, Rice cannot prevail on his damage claims. In support of their argument, plaintiffs point out that, under California law, it is well established that partners to a California partnership have no rights at law for damages against co-partners for any breach of the partnership agreement by a co-partner.

In *Stodd v. Goldberger,* 73 Cal.App.3d 827, 837, 141 Cal.Rptr. 67 (1977), the court held that "generally, partners or joint venturers may not bring suit against one another on causes of action arising from the partnership or joint venture business until there has been a dissolution of the partnership or joint venture, a settlement of its affairs and an accounting." Similarly, in *Drdlik v. Ulrich,* 203 Cal.App.2d 360, 366, 21 Cal.Rptr. 642 (1962), the court (quoting *Cunningham v. deMordaigle,* 82 Cal.App.2d 620, 621–22, 186 P.2d 423) stated that:

Partners cannot sue one another at law in respect to any of the business of the partnership or to recover damages from one or the other of the copartners for a breach of a partnership agreement. The remedy is by a suit in equity for a dissolution of the partnership and an accounting and settlement of the partnership affairs. [Citing cases.]

**1428**

The reason for this rule is that until an accounting is had it cannot be known whether the joint venturer suing may not in fact be indebted to the joint venture, or to the other members of the venture, or that there may not be outstanding joint venture debts sufficient to exhaust the joint venture assets.

In response, Rice points out that in *Laughlin v. Haberfelde*, 72 Cal.App.2d 780, 165 P.2d 544, 548 (1946), and *Barlow v. Collins*, 166 Cal.App.2d 274, 333 P.2d 64, 66 (1958), the courts recognized that there is a generally recognized exception to the general rule that partners cannot sue each other for damages. This exception was recognized in *Barlow*, 333 P.2d at 66, where the court stated:

Defendant relies on the general rule that a partner may not sue his copartner in an action at law in respect to firm transactions until an accounting has been had. While this general rule is well established, a different rule or at least an exception to the general rule, has been quite generally recognized and has been indicated and applied in several cases in this state. The general rule is particularly applicable to claims for damages arising out of the manner in which a partnership business has been conducted and to breaches of said agreements as such. But the reasons for applying the general rule are less forceful where the wrongful acts complained of are not only a breach of contract but constitute a tort, and this is especially true where the tort is of such a nature that it not only terminates the partnership but wrongfully destroys it, and where the erring partner converts to his own use its entire assets.

Furthermore, as stated in 59A *Am.Jur.2d,* Partnership § 623:

An action for damages by one partner against a copartner for the breach of fiduciary duties to the partnership or other partners, predicated on conduct constituting a wrongful appropriation of partnership assets or opportunities, may be brought outside the general rule requiring that all actions on partnership relations must follow a general accounting of the parties' interests.

Similarly, in *Pilch v. Milikin,* 200 Cal.App.2d 212, 19 Cal.Rptr. 334, 340 (1962), the California Court of Appeals held that:

Where, as in this case, some of the partners have excluded another and have appropriated the partnership property to their own use, the latter may treat the matter as a conversion and, without any accounting or disposition of the former partnership assets, sue the offending partners and recover against them a personal judgment in the amount of his damage. Conversion has been broadly defined as any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights thereto. (Citations omitted.)

Although Rice has titled his claims as claims for breach of the partnership agreements, the substance of his claims include wrongful conversion of partnership assets, breach of fiduciary duties, and wrongfully excluding Rice from the Oaklawn Courts Partnership. For example, Rice has alleged the following in his statement of additional causes of action, filed July 26, 1991:

33. [T]he Partners ... have failed to allow Donald [Rice] to act as a partner....

34. The Partners have allowed the Oak Lawn Court property to deteriorate, including waste of the Partnership assets and mismanagement of Partnership assets and have breached their fiduciary duties to Donald.

38. Cobin and Belkin retained approximately Seventeen Thousand Dollars ($17,000.00) of amortized loan proceeds when they closed the Merchants Mortgage loan, which is money that belonged to the Partnership.

41. The intentional interference with a contractual relationship, mismanagement, breach of fiduciary duty, negligence, fraud and excessive capital withdrawals by Cobin and Belkin resulted in a loss of value to the Partnership of One Million Four Hundred Thousand Dollars ($1,400,000.00).

47. Cobin and Belkin, upon best information and belief, have diverted Partnership income and assets for services of their own personal use, which must be reimbursed to the Partnership.

48. Certain insurance proceeds were paid by the Casselwood insurer to the Casselwood Partnership for property losses and upon best information and belief were not paid to the Partnership, but have been paid to Cobin and Belkin.

56. Certain insurance proceeds were paid by the McMillen Park insurer to the McMillen Park Partnership for property losses and upon best information and belief were not paid to the Partnership, but may have been paid to Cobin and Belkin.

Clearly, Rice's claims allege conversion, breach of fiduciary duties, and wrongful exclusion and, therefore, his claims fall outside of the general rule and he may bring an action at law against his copartners. Consequently, plaintiffs' motion for summary judgment on this point will be denied.

### C. Motion for Partial Summary Judgment on Don Rice's Claims for Breach of the Real Property Management Agreements

■ In 1982, Rice learned that an apartment complex in the City of Fort Wayne might soon be going on the market. Rice contacted his friend Harold Belkin in Los Angeles as he was aware that Belkin had sold a building in downtown Los Angeles and that he wanted to reinvest the proceeds from that sale. Eventually Harold Belkin and his cousin, Steve Cobin, purchased the apartment complex. This complex became known as Casselwood Apartments. Rice returned to Fort Wayne, Indiana and became the real property manager for Casselwood Apartments. Belkin and Cobin later acquired another apartment complex in Fort Wayne. This complex became known as McMillen Park Apartments. Rice was also the real property manager for McMillen Park Apartments. Later Rice, Belkin, and Cobin entered into the Oaklawn Courts Partnership, and Rice also became the real property manager for Oaklawn Courts Apartments.

With respect to each of the three apartment complexes that Rice was to manage, the parties entered into a Real Property Management Agreement setting forth Rice's duties and responsibilities. These three Management Agreements are substantially identical and provide, at Paragraph 3.6, that "either party may, upon seventy-two (72) hours notice, terminate this Agreement for cause. A material breach of any provision of this Agreement, or violation of law, shall constitute cause. A breach of Agent's fiduciary duties to Owner shall constitute cause."

In May of 1987, Rice was terminated as property manager of the three apartment complexes and Rice has asserted claims against the plaintiffs in this action for breach of the Real Property Management Agreements. Plaintiffs have filed a motion for partial summary judgment on Rice's claims for breach of the Real Property Management Agreements. Plaintiffs argue that the undisputed facts establish that the Partnerships had good cause to terminate Rice as real property manager. Specifically, plaintiffs argue that at the time of the termination, the partnerships were aware that Rice had engaged in repeated and remorseless insubordination, had failed to obtain public liability insurance, and had misrepresented his status to the Allen Superior Court. Furthermore, after terminating Rice and reviewing the books and records, the Partnerships discovered that Rice had diverted partnership assets to his personal business and household benefit, and had failed to maintain the necessary licenses to perform as property manager.

Paragraph 5 of each of the Real Property Management Agreements provides that "Owner shall have the absolute choice of law and governing jurisdiction of this Agreement as between California and Indiana." Plaintiffs have apparently elected California law as they cite to California law in their briefs [4].

■ Under California law, an employee claiming that he has been wrongfully terminated from employment bears the "ultimate burden" of proof. *Pugh v. See's Candies, Inc.*, 203 Cal.App.3d 743, 752, 250 Cal.Rptr. 195 (1988). The employee has the burden of

---

4. Rice has objected to plaintiffs' election of California law, suggesting that they were required to choose between California and Indiana law at the time the Agreement was executed. Rice has cited no authority for his position. Further, Rice has failed to show how the application of Indiana law would change the outcome of this motion.

showing a *prima facie* breach, the employer then has the burden of going forward with the evidence to show the reason for the discharge, and the employee may then attack the proffered explanation as pretextual or insufficient to meet the employer's contract or legal obligations. *Id.*

Plaintiffs have submitted the following arguments and evidence in support of their position that they had good cause to terminate Rice. With respect to Rice's alleged insubordination, plaintiffs claim that Rice failed to understand that as property manager he was an employee of the Partnerships, and as an employee was required to follow the instructions of his employers. Plaintiffs allege that Rice would not follow instructions because he deluded himself into believing that he was a partner in the Casselwood and McMillen Park Partnerships. Plaintiffs have submitted substantial, detailed evidence of Rice's insubordination, including letters in which Rice vehemently and crudely attacked the integrity of Steve Cobin, the managing partner of the Partnerships. Additionally, in an internal memo, Rice wrote that "I told Cobin he was a two faced prevaricator and he had equally unkind statements about me." Plaintiffs contend that any employer would feel that it was well within his discretion to terminate an employee who showed this level of insubordination.

Additionally, the plaintiffs have evidence that Rice failed to obtain public liability insurance for Oaklawn Courts Apartments, in contravention of Paragraph 2.12 of the Management Agreement. As a consequence, when a slip-and-fall injury occurred at Oaklawn on December 30, 1985, there was no insurance to cover the incident, and the Partnership was required to pay $12,000 of its own funds to settle the potential claim.

Plaintiffs' evidence also shows that Rice failed to maintain the necessary licenses to function as a property manager in Indiana, even though he himself had informed Belkin that such licenses were necessary. The Partnerships paid the cost (over $500) to have Rice properly licensed. The plaintiffs have further presented evidence that Rice had misrepresented to the Allen Superior Court that he was the owner of McMillen Park Apartments. Finally, the plaintiffs have presented evidence that Rice diverted Partnership assets to his personal and household benefit.

Defendant has submitted an answer brief in response to plaintiffs' motion for partial summary judgment. With respect to plaintiffs' arguments and evidence that the Partnerships had good cause to terminate the Real Property Management Agreements, Rice relies on his own 75–paragraph affidavit and accompanying exhibits in an attempt to establish genuine issues of material fact. In response to the claims of repeated insubordination, Rice first denies that he was an employee and asserts that he was an independent contractor. Rice also denies that insubordination is a good cause for terminating the Management Agreements. A review of Rice's affidavit makes it clear that he believed that he had the right to say anything he wanted to Cobin and Belkin if he disagreed with their way of managing the three apartment complexes. For example, Paragraph 32 of Rice's Second Affidavit reads, in pertinent part, as follows:

> I had the latitude as an equal partner, and the duty to strongly and vociferously present and make understood the nature of any real or perceived problems with the operations of the businesses which are the subject of this litigation.

Rice admits that he engaged in heated discussions with Cobin but argues that neither Cobin nor Belkin warned Rice that such heated discussions were good cause for termination. Rice further argues, without supporting evidence or authority, that everything he told Cobin was a truthful statement and truthful statements cannot constitute insubordination or give rise to good cause for termination.

First, the court notes that it is immaterial whether Rice was an employee or an independent contractor. In either instance, insubordination is a good cause for termination. Rice has not presented any authority for his position that an independent contractor can disregard orders and verbally abuse those who provide his paycheck, and this court is not aware of any such authority. Next, the evidence plainly shows that as a

real property manager, Rice was expected to follow the instructions and was not given the authority to run the apartment complexes as he saw fit. In this case, the Management Agreements gave Rice limited authority and required that he submit periodic statements to the Owners and get approval for some expenditures, such as repairs costing more than $500. Moreover, the evidence does not support Rice's belief that he had the right, as an equal partner, to object (in abusive language) to the way the apartment complexes were to be managed on a day-to-day basis. With respect to the Casselwood and McMillen Park Partnerships, Rice was not a partner but held options to become a one-third partner, and by entering into the Real Property Management Agreements he became an employee of the Partnerships. Rice was a partner (but not the managing partner) in the Oaklawn Courts Partnership, but nevertheless, by entering into the Real Property Management Agreement he also became an employee of the Oaklawn Courts Partnership.

■■■ Rice has not presented any evidence to support his position that he was a partner in the Casselwood and McMillen Partnerships or that he was not an employee of all three of the Partnerships. And, in fact, Rice is collaterally estopped from arguing these points. In a companion case in the Noble Superior Court, Senior Judge Edward Meyers granted defendants' (the law firm of Rothberg, Gallmeyer, Fruechtenicht & Logan and attorneys T. Russell Strunk, Jr. and Thomas M. Gallmeyer) motion for summary judgment on plaintiffs' (Don and Jackie Rice) complaint alleging material mis-representation of facts, breach of fiduciary duties, breach of duty to evaluate legal and ethical responsibilities, and conspiracy to defraud plaintiffs or to breach fiduciary duties owed to plaintiffs by others.

In his findings of facts Judge Meyers stated that:

6. Donald G. Rice was a partner in the Oaklawn Courts Partnership.

8. Two other partnerships were formed of which Cobin and Belkin were partners and in which Donald Rice was given an option to purchase an interest in the partnerships.

13. At all times pertinent to the Complaint:

A) Donald Rice was a partner in the Oaklawn Courts Partnership and had an ownership interest in Oaklawn Courts Apartments by way of his partner status;

B) Donald and Jacqueline Rice were employees of the three partnerships under separate contracts for the management of each of the three apartment complexes;

C) Jacqueline Rice was at no time a partner, nor did she have an ownership interest in the properties.

24. Don Rice was both a partner in Oaklawn Courts Partnership and an employee of the partnership.

Plaintiffs have argued that Judge Meyers' findings, as a final decision on the merits, are preclusive against Rice in these proceedings. Rice has not responded to this argument.

■■■ Collateral estoppel applies where the party seeking estoppel can show: 1) a final judgment on the merits in a court of competent jurisdiction; 2) identity of the issues; and 3) the party to be estopped was a party or the privy of a party in the prior action. *Tofany v. NBS Imaging Systems, Inc.,* 597 N.E.2d 23, 26 (Ind.App.1992). Offensive use of collateral estoppel occurs when a plaintiff (or a party similarly situated) seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with the plaintiff or another party. *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 4, 99 S.Ct. 645, 649 n. 4, 58 L.Ed.2d 552 (1979).

■■■ A party asserting offensive collateral estoppel bears a heavier burden than a party who asserts defensive collateral estoppel. Where the use of offensive collateral estoppel is being asserted, the "general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Id.* 439 U.S. at 331, 99 S.Ct. at 652. Due to the vast number of parties and the complexity of the subject matter of both the present

and the prior lawsuit it is clear that joinder of the two causes of actions would not have been feasible. The court must next determine whether the use of offensive collateral estoppel would be unfair to the defendant. *Parklane* detailed several situations where the use of offensive collateral estoppel would be unfair to a defendant: (1) where there was little incentive for the defendant to vigorously litigate the issue in the prior suit; (2) where the decision relied upon as the basis for the estoppel is inconsistent with prior judgments in defendant's favor; and (3) where the second action has procedural opportunities not available in the first action that "could readily cause a different result." *Id.* 439 U.S. at 331, 99 S.Ct. at 651.

None of the reasons which counsel against a trial court exercising its discretion to grant the use of offensive collateral estoppel are present here. Defendant Rice has not even argued to the court that he did not vigorously litigate all of the issues in the prior lawsuit. The decision relied upon as the basis for the estoppel is not inconsistent with prior judgments, and the present action has no procedural opportunities that were not available in the prior suit. Thus, plaintiffs are entitled to assert the doctrine of offensive collateral estoppel in this action and Rice is barred from relitigating the issues of whether he was an employee of the three Partnerships and whether he was a partner in the Casselwood and McMillen Park Partnerships.

As an employee, Rice could be terminated for good cause. Rice, in response, simply states that there was not sufficient good cause to terminate him. Yet Rice does not contest any of the following facts as asserted by plaintiffs in support of their claim that Rice was guilty of insubordination:

1. Rice's insubordination, according to Cobin, was one of the reasons for Rice's termination. Over a period of years, the problem became acute, to the point where Cobin felt Rice was "out of control."

2. Rice does not deny that he would not follow instructions because of his belief that he was not in a subordinate (employer/employee) relationship under the management contracts.

3. Rice does not deny that he refused to take direction from Cobin, the managing partner. Rice would scream at Cobin and was rude and abusive to him. Numerous letters evidence this hostility.

4. Rice does not deny that in an August 28, 1985 letter, Rice accuses Cobin of "systematic raping" of Casselwood; of violating good business practices; of attacking Rice's business credibility; of trying to "suck $1,000,000" from Casselwood and an extra $7,000 per month; and of "reprehensible" and "shameful" conduct. Rice states that Cobin's conduct appalls him, given Cobin's "overriding greed." Rice also accuses Cobin of screwing up; of manipulating Rice's ability to manage; of not giving a damn about the employees; and of actions which Rice describes as "condescending," a "slap in the face to every loyal employee," and "reprehensible!"

5. Rice does not deny making an anti-Semitic joke in a letter to Cobin (who is Jewish).

6. Rice does not deny screaming at Cobin and calling him a two-faced prevaricator.

7. Rice does not deny telling Cobin and Belkin that hiring a certain employee was a mistake; and that Cobin and Belkin "should have consulted" with Rice.

8. Rice does not deny making a political contribution with partnership assets, and does not deny that, after Cobin instructed him never to do this again, he wrote a letter claiming his actions were completely proper, implying that he would do the very same again.

9. Rice does not deny that he routinely disregarded Cobin's instructions that he have cosignature on all checks in excess of $1,000, or seek permission to do otherwise by phone.

Plaintiffs contend that any one of these nine instances of insubordination would constitute cause for termination as a matter of law and Rice's failure to controvert any of these nine instances is a sufficient basis upon which to grant plaintiffs' motion for partial summary judgment.

■ With respect to Rice's alleged misrepresentation of his status to the Allen Su-

perior Court, Rice admits that the misrepresentation occurred. However, Rice testifies in his affidavit that the *notarized* document bearing his signature above the word "Owner" was prepared and submitted to the court while he was out of town, by use of a rubber stamp signature, and thus he did not *knowingly* misrepresent that he was the owner of McMillen Park Apartments. Even accepting Rice's affidavit testimony, his testimony only supports the argument that he did not knowingly misrepresent his status. Nevertheless, Rice's state of mind is irrelevant. Rice permitted false information to be presented to a court of law. The plaintiffs have presented evidence that Judge Mathias was very displeased with the misrepresentation and informed Attorney Strunk that in the future McMillen Park would be required to be represented by counsel in all proceedings in the Small Claims Court. This court agrees with the plaintiffs that Rice's failure to take precautions to prevent misrepresentations was a dereliction of duty constituting good cause to terminate Rice.

■ With respect to the allegation that he failed to maintain property insurance on Oaklawn Courts Apartments for the period February 1985 to February 1986, Rice claims that he was unable to procure insurance for a reasonable amount and thus it was not his fault that the apartment complex had to pay $12,000 to settle a slip and fall injury claim. Rice further claims that pursuant to the Management Agreement, paragraph 2.12, Rice was only required to place insurance if it was economically possible. This is an untrue statement, as paragraph 2.12 clearly states "Agent will place insurance coverage for the subject property." Furthermore, Rice has not presented evidence that he was unable to procure insurance at an acceptable rate.

■ Rice also admits that during a certain period of time he did not have a real estate broker's license. Rice now claims that he was not required to have such a license since he was the authorized agent of the owners. Rice, in paragraph 54 of his affidavit, cites 876 IAC 1–1–3(r), which defines "Owner/seller" as "that person or persons of record in titled to or having an interest in the

property or their duly authorized representative." Rice also cites IC § 25–34.1–3–2(b)(8), which exempts from licensing requirements "acts performed by a person in relation to real estate owned by that person unless that person is licensed under this article, in which case the article does apply to him." Rice has thus creatively combined the definition section of the Indiana Administrative Code with a substantive section of the Indiana Code to support his argument.

■ First, the court finds it appropriate to strike Paragraph 54 of Rice's affidavit as inadmissible evidence as witnesses are not permitted to present legal argument, and legal conclusions are insufficient to "set forth facts as would be admissible in evidence" as required by Rule 56(e) of the Federal Rules of Civil Procedure. Even if the court would accept Rice's argument for consideration, the argument fails. Article 34.1 of the Indiana Code has its own definition section and does not define the term "Owner" and does not refer to the Indiana Administrative Code. Thus, the term "Owner" must be given its common dictionary meaning, rather than the meaning Rice ascribes to it. Rice is therefore not exempted from the licensing requirements by virtue the exception stated in IC § 25–34.1–3–2(b)(8).

■ Moreover, Rice represented to the Partnerships that he was required to have a broker's license, the Partnerships paid Rice's expenses of becoming a licensed broker, and Rice then failed to keep his license current, subjecting the Partnerships to potential liability. See *Hoffman v. Dunn,* 496 N.E.2d 818 (Ind.App.1986). Under these circumstances, the court agrees with the plaintiffs that Rice's failure to keep his license current constituted cause for his termination.

■ With respect to plaintiffs' allegations that Rice diverted partnership assets to his own business and personal uses, Rice admits that plaintiffs' evidence shows that the Partnerships were billed for items that were shipped to Rice's own apartment complex in Huntington, Indiana or to Rice's residence in Arlington. Rice merely states that he never intended for the Partnerships to pay for the items and the Partnerships did not pay for

the items. As plaintiffs point out, Rice has missed the point. Rice breached his trust to the Partnerships by using Partnership credit for his own personal benefit. Such unauthorized trading on the Partnerships' credit constitutes good cause for Rice's termination.

The court finds that the evidence overwhelmingly shows that the plaintiffs had good cause for terminating Rice as manager of the three apartment complexes. Accordingly, the plaintiffs' Motion for Partial Summary Judgment on Don Rice's Claims for Breach of the Real Property Management Agreements will be granted.

D. *Motion for Partial Summary Judgment as to Rice's Alleged Breach of the Option Agreements as to Casselwood and McMillen Park*

■ On June 20, 1983, Steve Cobin, Harold Belkin, and Donald Rice entered into an option agreement with respect to the Casselwood Partnership in which Cobin and Belkin were the optionors and Rice was the optionee. On March 9, 1984, Cobin, Belkin, and Rice entered into an option agreement with respect to the McMillen Park Partnership in which Cobin and Belkin were the optionors and Rice was the optionee. The two option agreements are substantially identical and provide in relevant part:

### Recitals

WHEREAS, OPTIONORS are the General Partners of CASSELWOOD PARTNERSHIP [and McMILLEN PARK PARTNERSHIP], hereinafter referred to as the "PARTNERSHIP", and more particularly described in Exhibit "A" which is attached hereto and by this reference made a part hereof; and

WHEREAS, OPTIONEE desires to acquire the exclusive right to purchase, without becoming obligated to purchase, a one-third (⅓) interest in said Partnership at an agreed price and under specified terms and conditions;

NOW THEREFORE, it is agreed as follows:

### Grant of Option

1. OPTIONORS hereby grant to OPTIONEE the exclusive right to purchase a one-third (⅓) interest as a General Partner at a price and under the terms and conditions set forth below.

### Option Period

2. This Option shall only be exercisable by OPTIONEE or heirs on June 30, 1988 [with respect to the Casselwood Option and on March 1, 1989 with respect to the McMillen Park Option].

### Consideration

3. This Option is granted in consideration of payment by OPTIONEE to OPTIONORS of the sum of $10.00 and for other good and valuable consideration the receipt of which is hereby acknowledged.

### Exercise of Option and Terms

4. If OPTIONEE desires to exercise this Option on the date indicted in Paragraph 2, OPTIONEE shall give not less than thirty (30) days' written notice to OPTIONORS of his intention to exercise the Option on said date.

The terms for the exercise of the Option shall be all cash on the date of closing. The price to be paid by OPTIONEE shall be the amount on the books and records of the Partnership, calculated as one-third (⅓) or (33⅓%) of all cash advances, loans, or out-of-pocket sums in excess of the cash required to close [the Casselwood and McMillen Park Purchase Agreements], reduced by distributable profits actually returned to OPTIONORS.

### Automatic Termination

5. If OPTIONEE fails to exercise this Option in accordance with its terms and within the option period, then this Option and the rights of OPTIONEE shall automatically and immediately terminate without notice. Thereafter, OPTIONEE shall properly execute, acknowledge, and deliver to OPTIONORS within ten (10) days of request therefore, a release, or any other

document required by OPTIONORS to verify the termination of this Agreement.

### Assignability of Option

6. OPTIONEE shall not assign this Agreement under any condition, except to heirs.

\* \* \* \* \* \*

### Notices

7. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by either party to the other may be effected by personal delivery in writing or by certified mail, postage prepaid, return receipt requested, and shall be deemed communicated as of three (3) days from mailing. Mailed notices shall be addressed as set forth below, but each party may change his address by written notice in accordance with this paragraph.

### Entire Agreement

8. This instrument contains the entire Agreement between the parties relating to the Option herein granted. Any oral representations or modifications concerning this instrument shall be of no force and effect excepting a subsequent modification in writing, signed by the party to be charged.

After Rice was terminated, Cobin and Belkin cancelled the option agreements and treated Rice's attempted exercise of the options as ineffective.

In their motion for partial summary judgment, plaintiffs claim that Rice could only exercise the two option agreements if he satisfactorily performed as property manager under the Real Property Management Agreements (discussed above in connection with the previous motion). Plaintiffs argue that Rice's satisfactory performance as property manager was given as consideration for the option agreements, and since the court has found that Rice was terminated for cause in May of 1987, the option agreements are unenforceable.

Plaintiffs argue that Rice agreed in his deposition that part of the consideration for the option contracts was Rice's agreement to manage the properties. Plaintiffs direct the court to the following deposition excerpts:

Q. At the time the first offer to purchase Casselwood was made, what is your basis for understanding that you would be given a one-third equity? In other words, what were you bringing to the transaction that would be worth one-third of the value of Casselwood?

A. What I was bringing to the transaction was the transaction, that's number one. And the deal was that I had to go back and manage the place.

\* \* \* \* \* \*

Q. What about between March of 1983, when H [the first Casselwood Purchase Agreement] was executed, and January 18, of 1984, when I is dated, that's the second agreement to purchase Casselwood. Did you feel during that intervening period of time that there was some necessity to memorialize in written form your relationship with Mr. Cobin and Mr. Belkin?

A. There may have been a letter to that over some confrontation in late 1983. It seems to me that there was. I never felt that we needed more than we had.

I always felt that this deal would go on the merit of how our relationship worked. In other words, if it didn't work out, this deal was going to fall apart, one way or the other.

If we didn't manage it right and if we didn't get along right, that deal, you can always break a deal, as you well know.

\* \* \* \* \* \*

Q. Okay, was the original [Casselwood option agreement] executed in part, Mr. Rice, to induce you or encourage you to use your best efforts to look after the assets at Casselwood and see to it that the apartment was well managed and occupied?

A. That was maybe an understanding that we all had. The understanding was that the better this property was managed, the more money that we would all make.

\* \* \* \* \* \*

Q. Was part of the reason for [the McMillen Park option agreement] to create

in you some equity in McMillen Park so that you would have a reason to expend your best efforts to improve the property and maintain it, make sure that it was well run?

A. I can't speak for Cobin and Belkin, but that certainly is a legitimate, it would seem to me a legitimate reason.

Rice Dep. at 108, 123, 152, 217–18.

Plaintiffs also refer to the "Declaration of Steven M. Cobin, Harold Belkin, Marsha Hendler and Susan Cobin" which states in part:

2. In connection with the transactions, it was the understanding of Steve Cobin of what the parties wished to accomplish that the option agreements were tied to the management agreements, in that for Don Rice to be in a position to exercise his options he first had to perform adequately under the management agreements. If Rice failed to perform adequately, for example, if he were terminated as real property manager for cause, the options would fail and were unenforceable.

Plaintiffs conclude that the parties agree as to the relationship between the options and the management agreements and thus there are no disputed material issues of fact.

■ In response, Rice has filed an answer brief, a statement of genuine issues and a 71–paragraph affidavit [5] with accompanying exhibits. Rice has also filed a cross-motion for summary judgment requesting that the court rule as a matter of law that the option agreements are enforceable and that Rice properly exercised the options in a timely fashion entitling him to be a one-third partner in the Casselwood and McMillen Park Partnerships.

■ Essentially, Rice argues that it was never intended by any of the parties that Rice had to satisfactorily manage the apartment complexes as consideration for the option agreements.[6] Rice contends that Cobin and Belkin have dreamed up this requirement in an attempt to prevent Rice from taking a one-third share of a prosperous enterprise. Rice claims that he gave valuable consideration (apart from the stated $10.00), such as a finder's fee for finding properties for Cobin and Belkin to invest in, and five years' worth of depreciation deduc-

5. Plaintiffs have filed a motion to strike Rice's affidavit in its entirety. Plaintiffs allege that the affidavit consists almost entirely of Rice's personal arguments, conclusions of law, and beliefs. The court agrees that portions of the affidavit appear to inadmissible conclusions and arguments. However, the portions of the affidavit relied upon by the court in this order are clearly admissible as these portions of the affidavit merely explain Rice's deposition testimony by placing the testimony in context with the rest of the deposition. This is clearly a permissible use of a Rule 56 affidavit as Rice's testimony sets forth facts which would be admissible in evidence. See Rule 701(b) of the Federal Rules of Evidence. Thus, plaintiffs' motion to strike affidavit will be denied.

6. Plaintiffs, in their reply brief, assert that this court's ruling of October 21, 1988 is the law of the case as to the effect of the contract documents and the court's rulings cannot be upset by reargument or by introducing factual assertions into the record. This court's order of October 21, 1988, was entered in *Casselwood Partnership v. Donald G. Rice, Jr.*, F88–37, which case has been consolidated with the present case. The October 21, 1988 order denied defendant Rice's motion to dismiss Count IV of plaintiff's complaint (and also denied Rice's motion for summary judgment on Counts I, II, and III of plain-

tiff's complaint). Count IV of plaintiff's complaint sought a declaratory judgment on the enforceability of the Casselwood option agreement, one of the two option agreements which are presently the subject of plaintiffs' motion for partial summary judgment. In denying the motion to dismiss, this court stated:

Plaintiff contends that the other good and valuable consideration was defendant's proper performance of his duties under the Property Management Agreement.... In the Option Agreement there is no definition of what comprises the "other" consideration, and therefore, plaintiff may seek to prove its plausible meaning of "other." Finally, the Property Management Agreement and the Option Agreement were executed simultaneously. Where simultaneous agreements are entered into, one as consideration for the other, the transactions are bound together. Williston, *supra*, § 637. The only effect of this court's October 21, 1988 order was to declare that plaintiff, the non-moving party, had convinced the court that it had a possibility of proving the facts necessary to support its claim for relief on Count IV. Thus, the court permitted plaintiffs' claims to go forward, entitling either party to seek summary judgment on the issue of whether Rice's option to purchase a one-third share of the Casselwood Partnership was conditioned on his satisfactory performance of his duties under the Management Agreement.

tions that were split between Cobin and Belkin who were in the highest income bracket for tax purposes. Rice did not need the depreciation deductions as he had business loss carry-overs from previous years.

Rice also points out that the unambiguous language of the option agreements allow Rice's heirs to exercise the option, which implies that Rice's satisfactory management of the apartment complexes was not a requirement for exercising the options. Further, the option agreements and the management agreements do not refer to each other, implying that they are not to be read together, and there is no warrant of continuing satisfactory management contained in the option agreements or in the management agreements. Rice thus concludes that there has been no failure of consideration in this case.

Rice, in his affidavit, has explained the context of the portions of his deposition that plaintiffs have cited. Rice contends that the deposition answers cited by plaintiffs were not in response to questions concerning the consideration for the option agreements but were answers to questions concerning the parties' discussions of their first offer to purchase Casselwood (which offer contemplated Rice being a full one-third partner immediately) and the parties' continuing negotiations which led to the second offer to purchase Casselwood. Rice has also submitted additional portions of his deposition which he claims support his position that satisfactory management was not consideration for the option agreements. Specifically, Rice testified in his deposition as follows:

Q. And yet you are telling me that Plaintiff's Exhibit L, [the Casselwood Partnership Agreement] which excludes you as a partner in the Casselwood partnership, is agreeable to you today, even though it is executed June 21, 1983?

A. That's what I am saying, absolutely. That's exactly what I'm saying. In March of 1983, our deal was that I was going to be a one-third partner.

Between that period of time, March and June, the circumstances were changed. I told you that for all intensive purposes, Cobin and Belkin and I agreed that I was a defacto partner and that the option agreement, and I told you the reasons for the option agreement.

\* \* \* \* \* \*

Q. Why did you agree to be a defacto partner?

A. I just told you. They agreed, we changed our deal so that they would put up all the necessary money, the 122 thousand some dollars that was required to close. They received the depreciation for five years, and that was the finalization of our agreement.

Q. In 1983, am I not right, that your income tax returns show that you and your wife made about $6,000?

A. I don't know if you have those, but I would have to check my schedule C and see.

Q. I would certainly say in 1983, 1982 and 1981, you didn't need $60,000 worth of depreciation?

A. That was the whole point. That's the absolute point of it.

Q. So that didn't change between December, 1981–82, when you learned about the potential in Casselwood, and March of 1983, when you signed the original Exhibit H [the first offer to purchase Casselwood]? You never needed the depreciation?

A. I never needed the depreciation. I had losses that were carried forward, if I recollect correctly.

\* \* \* \* \* \*

Q. How did it come about, that you were designated as the real property management for this particular asset, the Casselwood property?

A. It seems to me that Cobin and Belkin wanted me to go back and manage the property, one of the three of us, so that they would have, so that we would all have a handle on the day to day operations.

I think Harold has testified previously that he had some unfortunate experiences in Chicago, and they wanted somebody that they knew managing the property.

Q. Was the purpose of the option agreement in part, as understood by you, Mr.

Rice, to give you some stake in the assets represented by Casselwood?

A. No.

\* \* \* \* \* \*

Q. If the value of Casselwood, rather than being a sale, if the value of Casselwood increased between June 20th, 1983, to date, recited on Plaintiff's Exhibit N [the Casselwood option agreement], and whatever date you exercised your option, what would your rights have been as you understood them?

Would you partake in the increased value?

A. I would not only partake in the increased value, I would get money back, according to the option agreement, depending upon how much money was actually withdrawn over and above the cash that was necessary to close the transaction.

I mean this option is just very clear cut to me.

Rice Dep. at 134–136, 150–152.

This deposition testimony, coupled with the language of the option agreements, clearly raises a reasonable inference that the consideration given for the option agreements (which consideration was acknowledged to have been received) was Rice's foregoing a depreciation deduction for five years. There is no reference in the option agreements to the management agreements (or vice-versa), and Paragraph 8 of the option agreements declare each option agreement to be the "entire Agreement between the parties relating to the Option herein granted." Viewing these facts and inferences in the light most favorable to Rice, the non-moving party, it is clear that Rice has shown that a material factual dispute exists, precluding a grant of summary judgment in favor of the plaintiffs.

 As noted earlier, Rice has also requested summary judgment on his claim against plaintiffs for breach of the option agreements. Rice argues that it is uncontradicted that he met and complied with the material terms of the option agreements with respect to his intent to exercise the options by notifying all of the parties pursuant to Paragraphs 4 and 7 of the option agreements.

First, although Rice's evidence is sufficient to defeat plaintiffs' motion for summary judgment, it is not sufficient to permit him to prevail on his own motion. If the court looks at all of the evidence in the light most favorable to the non-moving parties, the plaintiffs in this instance, a reasonable inference arises that Rice lost his opportunity to exercise his options when he was terminated as property manager. Due to these conflicting inferences, a jury will have to decide this issue.

Furthermore, plaintiffs' evidence raises a dispute as to whether Rice properly exercised the options. Although Paragraph 4 of the option agreements clearly indicates that the one-third share in the partnerships were to be purchased with cash, Rice has taken the position that he is entitled to his one-third share without paying any money. Rice claims, without supporting evidence, that there were no cash advances, loans, or out-of-pocket sums in excess of the cash required to close on the purchase agreements, and thus he was not required to put up any cash to exercise his options. Plaintiffs claim, also without supporting evidence, that the partnerships had plainly incurred, at the very least, out of pocket sums in the operation and maintenance of the apartments for a period of several years, and thus Rice was required to pay cash to exercise his options. Either argument is plausible and apparently the issue can only be resolved by an examination of the books and records of the partnerships.

Finally, there is a factual dispute as to whether Rice gave 30 days notice of his decision to exercise his options as required by Paragraph 4 of the option agreements. Rice has presented evidence that he gave notice many months in advance of the actual dates he was permitted to exercise his options. Plaintiffs have presented evidence that, at least with respect to the Casselwood option, Rice's notice was several days tardy. As there is an abundance of conflicting evidence on the issue of whether Rice properly exercised his options (even if the options were not unenforceable for lack of consideration), summary judgment must be denied.

### Conclusion

For all of the foregoing reasons plaintiffs' Motion for Partial Summary Judgment De-

claring Oaklawn Partnership Dissolved is hereby GRANTED. The plaintiffs shall be permitted to continue the operation of Oaklawn Courts, but only to the extent necessary to wind up the Partnership's affairs, discharge its obligations, and preserve and distribute its assets.

Further, plaintiffs' Motion for Partial Summary Judgment as to Rice's Claims for Alleged Breaches of the Oaklawn Courts, McMillen Park and Casselwood Partnership Agreements is hereby DENIED.

Further, plaintiffs' Motion for Partial Summary Judgment on Don Rice's Claims for Breach of the Real Property Management Agreements is hereby GRANTED.

Further, plaintiffs' Motion for Partial Summary Judgment as to Rice's Alleged Breach of the Option Agreements as to Casselwood and McMillen Park is hereby DENIED.

Further, plaintiffs' Motion to Strike Affidavit is hereby DENIED.

Further, Defendant's Cross–Motion for Partial Summary Judgment is hereby DENIED.