790 A.2d 225 (2002)
347 N.J. Super. 414
SEBRING ASSOCIATES, a New Jersey Partnership; James N. Canino; and Anthony R. Palmeri, Plaintiffs-Respondents,
v.
Eugene J. COYLE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 2002.
Decided February 6, 2002.
*226 Anthony P. Ambrosio, Bloomfield, argued the cause for appellant, (Ambrosio, Kyreakakis, Dilorenzo, Moraff & McKenna, attorneys; Mr. Ambrosio, of counsel and on the brief; Andrew J. Kyreakakis, on the brief).
Theodore L. Abeles argued the cause for respondents, (Tompkins, McGuire, Wachenfeld & Barry, Newark, attorneys; Mr. Abeles, of counsel and on the brief; Brian M. English, on the brief).
Before Judges BAIME, FALL and AXELRAD.
The opinion of the court was delivered by BAIME, P.J.A.D.
The principal question presented by this appeal is whether a partner's refusal to contribute necessary capital to the partnership constitutes misconduct sufficient to warrant judicial dissolution. Following a twenty-eight day trial, the Chancery Division judge issued an extensive written opinion in which she found that defendant Eugene Coyle's failure to contribute funds necessary to the survival of Sebring Associates constituted a breach of the partnership agreement and grounds for dissolution of the partnership. The judge entered an order excluding defendant from the partnership, permitting the remaining partners, James Canino and Anthony Palmeri, to continue operation of the business, and awarding plaintiffs various items of damage. Defendant appeals. We affirm that portion of the Chancery Division's judgment excluding defendant from membership in the partnership, but remand the matter to the Chancery Division for further proceedings respecting damages.

I.
The protracted trial produced a record exceeding 7,000 pages. Much of the evidence pertained to complex business transactions and arcane accounting principles that are not directly in issue. Our recitation focuses only upon those facts critical to our disposition of the issues presented.
In November 1984, Canino, Palmeri and Coyle formed 170 Prospect Associates for the purpose of acquiring land and erecting high rise apartments. As a preliminary step, the three created Brewring Associates, which purchased two sites, 170 Prospect Avenue and 300 Prospect Avenue, in the City of Hackensack. After Sebring was formed, the latter property, 300 Prospect Avenue, was sold at a profit of millions of dollars in excess of the combined purchase price of both sites. The sale price was sufficient to satisfy the short-term mortgage and provide the three partners with a distribution of over $3.5 million which was shared equally.
*227 The partners' attention then focused upon the construction of luxury apartments at the 170 Prospect Avenue site. Canino and Palmeri were experienced in high rise residential development-Canino as a builder and Palmeri as a manager. Coyle was a highly successful orthopedic surgeon, but, as the owner of two large apartment complexes, was not a neophyte in the field of residential management. Although the point was hotly contested at trial, the general understanding of the partners was that Canino would serve as the general contractor, Palmeri would manage development of the property, and Coyle, through his accumulated assets and financial statement, would provide the financial strength necessary to obtain the requisite financing.
The development plan envisioned several phases. First, Excelsior I, a luxury apartment building, was to be constructed. Thereafter, a second tower and a "core" amenities building were to be erected.
Friction between Coyle and the other two partners developed almost immediately. In 1986, the partnership obtained a $35 million building loan from Howard Savings for the construction of Excelsior I. The loan increased in increments for further construction and acquisition through 1991 to a face value of approximately $45 million. To secure the performance and completion bond, it was necessary to post a $2 million working capital fund and a $2 million letter of credit. According to Canino and Palmeri, Coyle reneged on his promise to pledge $2 million to secure the requisite letter of credit. Ultimately, the crisis was narrowly averted when Canino and Palmeri provided the requisite collateral through some innovative financing.
Construction of Excelsior I was completed in June 1988. Because construction costs had been kept in tight control, interim surplus funds were available. In October 1988, each partner received a distribution of $600,000. This distribution was in addition to a $432,000 payment that had been made earlier, and to monthly payments of $10,000 that had commenced the previous year.
A downturn in the real estate market impacted on the financial integrity of the partnership by late 1989. The interest reserve maintained by Howard was inadequate because rentals were slow. To make matters worse, Howard's financial problems precluded it from providing funding for completion of the second tower and the amenities building, thus diminishing rental rates at Excelsior I.
Sebring approached Powder Mill Bank to obtain additional funding. Powder Mill's lending limit per transaction was $900,000. Because approximately $3 million were needed, the partners and the bank developed a plan in which separate $900,000 loans would be issued to each partner individually. Each partner thus signed a separate note and pledged individual collateral, but the amounts obtained were immediately transferred to Sebring. The transaction was shown in Sebring's financial statements as loans from the partners. Conversely, Coyle, and presumably Canino and Palmeri, did not list the Powder Mill loans as liabilities on their personal financial statements.
As the financial condition of the partnership became increasingly problematic, Palmeri apprised the parties in a series of letters that additional cash contributions were necessary. For example, in a June 26, 1991 letter to Canino and Coyle, Palmeri directed each partner to contribute $18,000 monthly toward Sebring's expenses, including payments on the three Powder Mill notes. While Canino and Palmeri infused the partnership with additional funds, Coyle generally ignored these letters and made no payment after 1991.
*228 Because of Coyle's recalcitrance, Sebring made payments on the Powder Mill loans to Canino and Palmeri, but stopped making payments on Coyle's loan. After Powder Mill was taken over by the FDIC, Canino's and Palmeri's loans were paid off, the amounts credited to the two partners' capital accounts. Coyle made several payments on his loan, but ultimately stopped. Paradoxically, no attempt to collect was made by the FDIC, and it now appears that Coyle's loan is uncollectible by virtue of expiration of the statute of limitations.
Plaintiffs presented additional evidence at trial tending to establish Coyle's lack of fidelity to the partnership. In June 1988, Coyle sold his luxury house to two doctors, Paul Rodigas and Susan Fox Rodigas, for $2.2 million. The buyers obtained a $1.5 million bank mortgage, and Coyle took back a $500,000 second mortgage. The same month, Coyle moved into a penthouse apartment at Excelsior I. Although Coyle initially paid rent for the apartment, he ultimately stopped making these payments. While Coyle claimed at trial that he resided at the penthouse as an "accommodation" to the partnership to provide a "showplace" to prospective tenants and to "impress the bank," the evidence abounds the other way, as subsequently noted in the judge's opinion.
More importantly, plaintiffs asserted that Coyle improperly used the partnership to bolster Paul Rodigas' financial strength after the physician fell ill with a malignant brain tumor. Plaintiffs claimed that Coyle enlisted the partnership and the individual partners in a business venture with the Rodigases without apprising them of Paul Rodigas's declining health. Although the parties devoted substantial attention to the issue, we describe only the bare outlines of the transaction.
Paul Rodigas was a cardiac surgeon. Approximately eighteen months after buying Coyle's house, Rodigas and Fox informed Coyle that Rodigas was diagnosed with a brain tumor. Although the original diagnosis was uncertain, Rodigas feared that he would be required to terminate his medical practice and would be unable to meet his mortgage obligation to Coyle. The tumor was later found to be malignant. Rodigas and Fox, along with Coyle, hatched a plan to establish a cardiac rehabilitation facility. Coyle arranged a presentation of the idea for Canino and Palmeri, proposing to establish a large office on the "professional floor" of Excelsior I. Coyle recommended the plan to Canino and Palmeri, concealing the fact that Rodigas suffered from a malignant brain tumor. As Coyle admitted at trial, had he told Canino and Palmeri that Rodigas had a malignant brain tumor, "[t]he meeting [with Canino and Palmeri would have been] over."
The management company established by Coyle was called Total Care Health Systems, Inc. The project eventually included not only cardiac rehabilitation services, but also a diet center and woman's care unit. The business occupied 5,100 square feet of office space at Excelsior I. Sebring was required to provide the "fit-up" expenses demanded by Rodigas and Fox for the office, costing approximately $400,000. The three partners and Rodigas and Fox borrowed $1,400,000 from Midlantic Bank, with all five signing personal guarantees.
The venture proved to be a fiasco. Rodigas abandoned the business and returned to his medical practice before dying. Midlantic filed suit on the personal guarantees. Canino, Palmeri and Coyle settled Midlantic's claim for $300,000 each. Although Canino and Palmeri paid their obligations in a timely manner, Coyle subsequently defaulted. Sebring itself suffered a major loss.
*229 Plaintiffs claimed that Coyle also showed his disloyalty to the partnership by initially refusing to sign loan refinance documents necessary to a restructuring of Sebring's debt. Sebring needed an extension of the terms of the Howard construction loan due in 1993, and a decrease in the interest rate. The cash flow of Sebring was insufficient to support repayment of principal because the borrowing had been in anticipation of a long-term permanent financing and additional construction financing for the second tower and core amenities building. The interest rate on the entire debt was scheduled to rise, and only a shell and foundation for the tower and the amenities building had been constructed.
Howard's perilous financial condition precluded it from financing the completion of the remaining buildings. However, it agreed to extend the loan for twenty-eight years and reduce the interest rate significantly for a period of time. The interest rate was then to be increased at various intervals. Without these modifications, the partnership could not survive. Coyle nevertheless refused to sign the loan documents. In a written statement dated January 27, 1992, Coyle demanded a guarantee that his partnership interest would not be decreased beyond twenty percent as the price for his agreement to sign the refinancing documents. Coyle also demanded the payment of substantial monies to him by Sebring as a condition for his consent to the restructuring agreement. Time was of the essence in accomplishing the restructure. Howard was within four months of being taken over by the FDIC and sold to First Fidelity Bank. After many threats to put the partnership in bankruptcy, Coyle finally signed the refinance documents.
It was during this time period that Coyle began secretly to tape record his conversations with Canino and Palmeri. We digress to note that before trial, several of the tapes were turned over to plaintiffs' attorney, who charged that Coyle had tampered with them by "overtap[ing]" conversations with the partners. Coyle withdrew his proffer to introduce the tapes in evidence.
The February 1992 restructure did not provide any additional money from Howard, so the need for cash calls continued. Canino and Palmeri responded by providing large infusions of capital. Coyle did nothing. From January 1 to May 1992 alone, Palmeri had to contribute personally $287,300, and Canino had to put in $808,500. From June 1992 through December, Palmeri contributed another $280,000 and Canino $60,500. Additional contributions thereafter had to be made in cash of $1,124,809 by Palmeri and $782,035 by Canino. Canino and Palmeri mortgaged their homes and personal properties to save Sebring.
Finally, Canino and Palmeri decided to terminate Coyle's interest in the partnership. The determination was confirmed in a letter dated June 17, 1992. According to the calculations of plaintiffs' expert, Robert DePasquale, as of December 31, Canino had a positive capital balance of $943,855, Palmeri had a positive capital balance of $824,054, and Coyle had a negative balance of $341,640.
At trial, plaintiffs presented evidence indicating that the partnership was in severe financial straits at the time of Coyle's termination. In April 1993, Howard's successor, First Fidelity Bank, obtained an appraisal valuing the Hackensack property at $35 million. The mortgage held by the bank was well in excess of $40 million. Although the judge harbored reservations concerning the accuracy of that appraisal, she found that "the real estate was still worth less than the mortgage amount" at *230 the time of the termination, and that Sebring had "no equity" in the property at that point.
We need not recount at length subsequent events pertaining to Sebring. Suffice it to say, in the seven years that passed between the termination of Coyle's partnership interest and the trial, Canino and Palmeri were able to obtain additional financing for completion of the second tower and the amenities building. The entire enterprise was turned from a losing venture to an extremely profitable one.
In her forty page opinion, Judge Marguerite Simon concluded that "Coyle's failure to meet the cash calls, his taping of conversations with partners, and his general refusal to accept responsibility [constituted] `conduct ... tend[ing] to affect prejudicially the carrying on of the business' [of the partnership] ... and a persistent breach of the partnership agreement" under sections 32(c) and 32(d) of the Uniform Partnership Law (UPL) (N.J.S.A. 42:1-1 to -49) (since repealed). In reaching this conclusion, the judge found specifically that Coyle's primary role in the Sebring partnership was to provide financial strength in order to obtain necessary financing, but that he utterly refused to satisfy that mission. The judge referred to evidence suggesting that Coyle had deliberately concealed his personal assets to avoid fulfilling his partnership obligation. The judge rejected plaintiffs' claim that Coyle was solely responsible for the Total Care debacle. We note in that respect, however, that the judge did not dismiss plaintiffs' theory that Coyle enticed the partners into participating in the Total Care venture in order to enable Rodigas to pay the debt owed to him. Nor did she discount the testimony that Coyle had concealed the severity of Rodigas's illness. The judge, instead, found that plaintiffs failed to prove that they relied on Coyle's misrepresentation in entering into the transaction. The judge entered an order terminating the partnership but allowing Canino and Palmeri to continue the business.
In determining Coyle's interest in the partnership and in assessing damages, the judge found that Coyle's Powder Mill loan, although technically a personal debt, was treated by Sebring as a partnership obligation. While noting that the debt was probably uncollectible because the limitations period had expired, the judge found that it was the responsibility of the partnership, and that Coyle could not be credited with the $900,000 amount in determining his capital contribution and monetary interest in the partnership.
The judge awarded Sebring $481,761.15, which amount included interest for money Coyle had withdrawn from the partnership in excess of his capital contribution, and $107,875.91 for the rent Coyle had failed to pay for the penthouse he occupied. Canino was awarded $9,165.93 for payroll taxes and other obligations he had paid for Coyle's benefit, and $28,202.85 for monies he had loaned to Coyle. Palmeri was awarded $51,470.21 for payroll taxes and other obligations he had paid for Coyle's benefit.
This appeal followed. Defendant argues: (1) the Chancery Division failed to adhere to the partnership agreement in divesting his partnership interest, (2) the $900,000 Powder Mill loan proceeds should have been considered a capital contribution, (3) Canino and Palmeri were guilty of acts of minority oppression and should have been estopped from seeking to divest Coyle of his partnership interest, and (4) the matter should be remanded for recalculation of Coyle's partnership interest. We have carefully considered these arguments and find no sound basis for disturbing Judge Simon's decision terminating *231 Coyle's partnership interest and allowing the remaining partners to continue Sebring's business. However, we conclude that the judge erred by failing to consider Coyle's Powder Mill loan as a capital contribution. We thus remand the matter to the Chancery Division for recalculation of damages.

II.
While not set forth in a separate point heading, see R. 2:6-2(a)(5), defendant's substantive arguments are permeated with general and specific attacks upon the Chancery Division judge's factual findings. We find no merit in defendant's claim that the judge erred in that respect.
The controlling principles are well settled. We are not to review the record from the point of view of how we would have decided the matter if we were the court of first instance. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). Rather, our aim is "to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record." Id. at 162, 199 A.2d 809; see also State v. Barone, 147 N.J. 599, 615, 689 A.2d 132 (1997); Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 475, 541 A.2d 1063 (1988). We are obliged to give special deference to the judge's findings that are "substantially influenced by [her] opportunity to hear and see the witnesses and to have the `feel' of the case," an opportunity that we, as an appellate court, cannot enjoy. State v. Johnson, 42 N.J. at 161, 199 A.2d 809.
Applying these principles, we find ample evidence in the record supporting Judge Simon's finding that: (1) Coyle's role in Sebring was to lend financial strength to the partnership for the purpose of obtaining financing, (2) Coyle failed to satisfy that partnership obligation by refusing to contribute necessary capital, (3) Coyle, at least in the first instance, improperly placed obstacles in the way of the partnership's obtaining a restructure of its Howard debt, (4) Coyle secretly tape recorded conversations with his partners, (5) Coyle failed to pay rent for the penthouse he occupied in Excelsior I, and (6) dissolution of the partnership and termination of Coyle's partnership interest constituted the only viable course to remedy these problems. We note that Judge Simon took great pains to express her findings respecting Coyle's lack of credibility. We have the benefit of these findings, which are fully supported by the record. While Canino and Palmeri were not always the model of truthfulness in their testimony, there is substantial support in the record for the judge's conclusion that Coyle lied and that he lied often. It is against this backdrop that we address defendant's arguments.

III.
We turn to defendant's argument that his refusal to make capital contributions to Sebring did not constitute an appropriate basis for termination of his partnership interest. Defendant contends that the partnership agreement prohibits the divestment of a partner's interest when he fails to satisfy calls for additional funds. He asserts that, under the partnership agreement, a partner's lack of ability or desire to make such contributions can never be a cause for the divestment of his partnership interest. Defendant claims that the partnership agreement may require dilution of a defaulting partner's partnership interest in such a case, but not divestment.
Defendant's argument rests on paragraph 14 of the partnership agreement. That paragraph provides in pertinent part as follows:

*232 (a) Call for Funds: The partners recognize that the income produced by the Partnership's properties may be insufficient to pay the operating costs of the properties. If additional funds are required to pay such operating costs, the additional funds shall be called for and shall be contributed by the Partners in proportion to their profit sharing interests in the Partnership shown in Paragraph 6. As used above, the term "operating costs" shall include, without limitation, principal and interest payments on Partnership loans, whether or not secured by mortgages on Partnership properties; costs of repair, maintenance and improvements; insurance premiums; real estate taxes, assessments and other governmental charges, as well as construction related expenses. The parties acknowledge that prior to the Closing of the construction loan for the Project, the Partnership may require funds for such matters as legal services, surveys, title examinations, architectural and engineering studies, market analyses, payments on account of the purchase price for the land, options, applications and submissions before governmental authorities, site inspections, inspections and laboratory fees. In addition, the Partners acknowledge that after construction commences and before the permanent loan is fully funded, the Partnership may require additional funds.
(b) Contributions for Non-defaulting Partners. If any Partner is unable or unwilling to make any or all of his proportionate contributions, then the remaining Partners shall have the right to make any or all of said contributions, in such amounts s they may agree among themselves for the balance. If they are unable to agree, each Partner who is able and willing to make a contribution shall have the primary right to contribute that portion of such excess which the proportion of such Partner's capital interest in the Partnership bears to the aggregate capital interest of all such Partners, and a secondary right to contribute any remaining portion of such excess which is not desired to be contributed by any other Partner in the exercise of his primary right. If there is more than one Partner desiring to exercise secondary rights, they shall be entitled to contribute the remaining portion of such excess in the same proportion as stated above with regard to their primary right.
(c) Contribution by Defaulting Partners. Any Partner who makes a contribution to the Partnership pursuant to Paragraph (b) above shall have the option to (1) treat the contribution as additional capital of the partnership, or (2) treat the contribution as a loan to the defaulting Partner, which election shall be made in writing, twelve months following the date of contribution.
(1) If the contributing Partner elects to treat his contribution as additional capital, such funds shall be allocated to his capital account. Each Partner's percentage interest in the profits, losses and cash flow of the Partnership shall be adjusted and determined by dividing the aggregate cash contributions of all the Partners to the Partnership since the inception of the Partnership into the aggregate cash contribution of each Partner. The resulting quotient with respect to each Partner shall be the adjusted percentage interest of such Partner. Such adjusted percentage interest of each Partner shall supercede the percentage interest of such Partner as set forth in Paragraph 6 above. *233 (2) After the twelve month period, if the contributing Partner elects to treat his contribution as a loan to the defaulting Partner, then no adjustment shall be made to the contributing Partner's capital account and his share in the profits, losses and cash flow of the Partnership shall remain the same. However, the capital account of the defaulting Partner shall be increased by the amount of the loan. The amount advanced by the Partner on behalf of the defaulting Partner shall be a debt of the defaulting Partner to the contributing Partner and shall bear interest at the rate of 1% over prime or the governmental imputed rate per annum, whichever is greater. Thereafter, all distributions of cash from the Partnership due the defaulting Partner shall be paid to the Partner (or pro rated to the Partners) who has elected to treat the contributions as loans, until such time as the principal and interest of the loan(s) are paid in full. (Emphasis added.)
Defendant contends that the phrase "aggregate cash contribution" in paragraph 14(c)(1) refers only to gross amounts a partner has paid into the partnership, and that these amounts are not to be diminished by distributions to or withdrawals by the partner. So posited, defendant argues that paragraph 14 provides a precise mathematical formula for adjusting each partner's percentage interest, having as its numerator the partner's aggregate cash contributions and having as its denominator all of the partners' aggregate capital contributions. He claims that under this formula, a partner's interest can become diluted when his cash contributions fall below those of the other partners, but it can never be reduced to zero.
In support of his position, defendant presented Frank Cerreta, a disbarred certified public accountant.[1] Cerreta testified that the term "aggregate cash contribution" referred to the "total" amounts of money put into the partnership by a partner, undiminished by withdrawals or distributions. A partner's interest in the partnership was said to be the ratio between the unnetted sum of contributions made by the partner and the unnetted sum of all of the partner's contributions.
Plaintiffs' expert, Robert DiPasquale, testified that a partner's withdrawals and distributions had to be considered in determining his capital account. He construed the phrase "aggregate cash contribution" as referring to the net sum of contributions made by the partner. So interpreted, DiPasquale computed a partner's interest by dividing the net sum of the partner's contributions by the net sum of all of the partners' contributions.
Judge Simon accepted DiPasquale's interpretation of paragraph 14 and rejected that of Cerreta. In making this determination, the judge noted that Cerreta's construction of the partnership agreement was inconsistent with Sebring's tax returns and financial statements. In contrast, Di-Pasquale's interpretation of the agreement comported with the manner in which Sebring had historically maintained its financial records. The judge also observed that the partnership agreement prohibited compensation, and thus it was appropriate to treat payments to the partners as withdrawals from their capital accounts. Adopting Di-Pasquale's detailed analysis of cash contributions and withdrawals, the judge found *234 that Coyle had a negative balance of $341,640.
The judge rejected another argument advanced by defendant, one that is resurrected here, that paragraph 14(c) establishes a one year "cure" period, during which a partner can correct imbalances in the partners' accounts. Defendant relied upon the clause in paragraph 14(c), which states that a contribution made in response to a cash call may be treated either as "additional capital of the [p]artnership" or "as a loan to the defaulting [p]artner," by an "election" which "shall be made in writing ... twelve months following the date of contribution." Defendant argued below, and continues to urge here, that plaintiffs did not adhere to paragraph 14(c) because they did not allow for correction of the imbalances in the partners' capital account during the one year periods following Palmeri's cash calls, and because they never made an election in writing treating the contributions of Canino and Palmeri as additions to their capital accounts. The judge rejected this argument based on her finding that the "custom and usage of the partners was such that they did not strictly comply with the election provision."
While finding that withdrawals and distributions had to be considered in determining a partner's "aggregate cash contribution," the judge did not base her decision dissolving the partnership on Coyle's negative balance. She, instead, relied upon N.J.S.A. 42:1-32(1)(c), (d) and (f). These subsections of the Uniform Partnership Law provide:
The court shall enter judgment of dissolution:
1. On application by or for a partner whenever
....
c. A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business;
d. A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him;
....
f. Other circumstances render a dissolution equitable.

[N.J.S.A. 42:1-32(1)(c),(d) and (f).][2]
In permitting Canino and Palmeri to continue the business of the partnership, the judge cited N.J.S.A. 42:1-38(2)(b).
*235 That subsection allows dissociating partners to continue the business of the partnership in the partnership's name.[3]
We agree with Judge Simon's disposition of these issues. It defies common sense and practical business realities to construe the term "aggregate cash contribution" as the gross amounts paid into the partnership undiminished by withdrawals and distributions. We are in complete accord with the judge's conclusion that Di-Pasquale's interpretation of paragraph 14 best advanced the parties' purpose and intent. We perceive no sound basis to disturb that determination.
We also agree with the judge's conclusion that the parties' custom and usage pertaining to the treatment of a partner's failure to answer cash calls was such that the requirements of paragraph 14(c) should be deemed to have been satisfied. We add that Palmeri's cash call letters to the partners and his comments concerning Coyle's continued defiance made it abundantly clear that the contributing partners had elected to treat their payments as capital contributions. In a similar vein, Coyle's defiant stance-his complete and utter failure to respond to repeated cash calls-renders nugatory his present reliance upon what he characterizes as the one year "cure" period.
Simply stated, defendant's consistent failure to respond to cash calls constituted a material breach of the partnership agreement. This violation warranted the Chancery Division judge's action dissolving the partnership and permitting continuation of the business by the surviving partners.
As we noted, Judge Simon did not base her order of dissolution on defendant's breach of paragraph 14. Rather, the judge relied on N.J.S.A. 42:1-32(1)(c), (d) and (f). We agree with this conclusion. More specifically, we hold that Coyle's failure to respond to cash calls "affect[ed] prejudicially the carrying on of [Sebring's] business," N.J.S.A. 42:1-32(1)(c), and made it "reasonably [im]practicable to carry on the [partnership] business" with him remaining a partner, N.J.S.A. 42:1-32-1(d).
We have found no reported New Jersey opinion dealing with the precise issue. However, in Cobin v. Rice, 823 F.Supp. 1419 (N.D.Ind.1993), the United States District Court entered an order dissolving a partnership in circumstances strikingly similar to those present here. Cobin, Belkin and Rice formed a partnership in order to acquire and manage an apartment complex. Id. at 1423. After the original financing agreement expired, it was determined that renewal of the mortgage indebtedness was necessary, and that the current capitalization of the partnership was insufficient to continue the partnership's ongoing operations. Id. at 1423-24. The partnership agreement required the partners to contribute capital whenever partners holding fifty-one percent agreed that such a course was necessary. Id. at 1424. Rice refused to respond to repeated cash calls and refused to participate in the refinancing of the apartment building. Ibid. The remaining partners were thus required to assume Rice's financial obligation, and thereafter filed a complaint demanding dissolution of the partnership. Ibid. In entering an order dissolving the partnership, the court found that Rice's refusal to provide additional capital constituted a breach of the partnership agreement. Id. at 1426. The court added, "even in the absence of an explicit breach *236 of the [p]artnership [a]greement, Rice's failure to contribute the necessary capital... ma[de] it not reasonably practicable for the plaintiffs to carry on the [p]artnership's business" while he remained a partner. Ibid.
The Indiana Court of Appeals reached the same conclusion in Hansford v. Maplewood Station Bus. Park, 621 N.E.2d 347 (Ind.App.1993). The plaintiffs and Hansford formed a partnership to acquire and develop land for residential construction. Id. at 349. After Hansford refused to participate in a restructure of the partnership's debt and refused to contribute additional cash contributions, the remaining partners assumed his burden, and then filed a petition for dissolution of the partnership. Ibid. The trial court entered an order dissolving the partnership. Ibid. Hansford appealed. Ibid. The court concluded that "[b]y refusing to contribute his share of the partnership's expenses ... and by his unwillingness to execute [refinancing] documents, ... [Hansford was] guilty of conduct that tended to affect prejudicially the carrying on of the business and made it impracticable for the other partners to continue in business with him." Id. at 351.
We follow the course adopted in Cobin and Hansford. While dissolution of a partnership with the consequent expulsion of a partner is undoubtedly a harsh remedy, we find particularly compelling the fact that Coyle was invited to join the partnership in order to attract necessary financing and that his conduct as a partner was wholly inimical to accomplishing that objective. Perhaps a lesser remedy might be equitable under less egregious circumstances. Here, however, Coyle's expulsion from the partnership was both fair and reasonable.

IV.
We next consider defendant's argument that the Chancery Division judge improperly failed to credit his capital account with the $900,000 loan proceeds from Powder Mill. Coyle emphasizes that he, not Sebring, signed the note and provided the requisite collateral, and that he, not Sebring, remains liable for the amount due upon default. We note, however, that Coyle's Powder Mill note appears to be uncollectible because the statute of limitations has expired. The question then is whether Coyle or Sebring is to receive the benefit of the windfall created by the loan's uncollectibility.
We do not regard as dispositive the fact that Coyle was the only named obligor on his individual Powder Mill debt. The three partners undertook separate $900,000 debt obligations only because of Powder Mill's single debtor limitation. The three loans were taken for the benefit of Sebring, and all of the proceeds of the loans were transferred to the partnership.
Although Powder Mill had no legal basis for collecting directly from Sebring, and apparently never attempted to do so, the fact remains that had Coyle been sued successfully by the bank, he could have sought indemnification against Sebring, provided the debt was found to be, in substance, a debt of the partnership. Under Section 18 of the UPL, a partnership "shall indemnify every partner in respect of payments made and personal liabilities reasonably incurred by him in the ordinary and proper conduct of its business, or for the preservation of its business property." N.J.S.A. 42:1-18(b). The judge found that the partners' individual debts were incurred for the benefit of the partnership. Thus, Sebring would ultimately have been responsible for payment of Coyle's debt. See Magrini v. Jackson, 17 Ill.App.2d 346, 150 N.E.2d 387, 390-92 (1958) (applying *237 the joint liability rule of section 15 of the UPA to partners who had agreed to convert an individual debt into a partnership debt); cf. LaMar-Gate, Inc. v. Spitz, 252 N.J.Super. 303, 311, 599 A.2d 928 (App. Div.1991) ("a partner has a right to have the other responsible partners joined" when he is sued for a partnership obligation).
We, nevertheless, conclude that Coyle should be given credit for the contribution to the extent it is uncollectible. When Canino and Palmeri settled their debts with Powder Mill, each was given full credit for his $900,000 cash contribution in his capital account, this despite the fact that neither was required to pay off the full amount of his loan. This was considered a fair solution because, whether or not Canino and Palmeri were required to fully pay off their debts to Powder Mill, Sebring had the benefit of the full amount of the loan proceeds. Sebring's accountant, Robert Jampol, testified that a forgiven debt should be considered capital in the accounts of the partners. DiPasquale agreed that a discharged debt must be transferred to capital.
The simple and overriding fact is that the capital accounts of Canino and Palmeri were increased by $900,000 each. Because Coyle's debt was not paid, his capital account was not credited even though he personally borrowed the money, put up the requisite collateral, and invested the funds in Sebring. If, as Coyle claims, the loan is uncollectible and is credited to his capital account, that would produce a windfall for him. However, that windfall would be at the expense of the bank, not the partnership. Sebring has had actual use of the money and, if the debt is uncollectible, has no obligation to pay off Coyle's loan. Under these circumstances, we believe that the interests of justice militate in favor of according Coyle the benefit of the uncollectibility of the debt. While such a result would have the effect of rewarding Coyle for his obstinance and audacity, we are convinced that it represents the most equitable result.
The problem we face is that the record suggests the Coyle loan is uncollectible, but no evidence was presented with respect to that issue. At oral argument, counsel could not agree. We are thus constrained to remand the matter to the Chancery Division to determine whether the Powder Mill debt is collectible.
The Chancery Division's disposition of this issue will have no impact on its order dissolving the partnership. Even if it later appears that Coyle has a positive balance in his capital account, that would not excuse his lack of fidelity to the partnership in refusing to respond to cash calls. The order of dissolution must stand.
The judge's determination will, however, impact on the question of damages. Under N.J.S.A. 42:1-38(2)(c)(II), Coyle has the right to the value of his partnership interest less any damages caused to his partners by the dissolution. Judge Simon did not determine the amount of damages that flowed from Coyle's failure to respond to cash calls, but limited that category of damages to the amount needed to remove defendant's negative capital account balance. In other words, the judge did not consider amounts allegedly advanced by plaintiffs for a defaulting Coyle and paid through Sebring to Midlantic Bank because that money, if paid, would have been credited to Coyle's capital account. If Coyle's capital account is to be credited with the Powder Mill loan, leaving defendant with a positive balance, those additional damages may be considered.
Defendant's remaining arguments are clearly without merit and do not require comment. R. 2:11-3(e)(1)(D) and (E). Accordingly, *238 the judgment granting plaintiffs' request for dissolution is affirmed, and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Cerreta was forced to surrender his license after entering a guilty plea to failing to file federal income taxes.
[2] The UPL was repealed by L. 2000, c. 161, § 59. It was replaced, effective December 8, 2000, by the Uniform Partnership Act (1996) (UPA), N.J.S.A. 42:1A-1 to -60. The UPA's analog to N.J.S.A. 42:1-32(1)(c), (d) and (f) is N.J.S.A. 42:1A 39(e), which authorizes dissolution of a partnership upon a judicial determination that:

(1) the economic purpose of the partnership is likely to be unreasonably frustrated;
(2) another partner has engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with that partner; or
(3) it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement.
The UPA also provides in N.J.S.A. 42:1A-31 for partner dissociation. It provides for the expulsion of a partner upon the occurrence of any number of events, including:
(1) the partner engaged in wrongful conduct that adversely and materially affected the partnership business;
(2) the partner willfully or persistently committed a material breach of the partnership agreement or of a duty owed to the partnership or the other partners under section 24 of this act [N.J.S.A. 42:1A-24, defining fiduciary duties]; or
(3) the partner engaged in conduct relating to the partnership business which makes it not reasonably practicable to carry on the business in partnership with the partner.
N.J.S.A. 42:1A-31(e).
[3] The UPA provides that upon expulsion of a partner, the surviving partners may waive the right to wind up the partnership business and may resume carrying on the partnership business as if dissolution had not occurred. N.J.S.A. 42:1A-40(b).