867 A.2d 1213

SEBRING ASSOCIATES, A NEW JERSEY PARTNERSHIP, JAMES N. CANINO, AND ANTHONY R. PALMERI, PLAINTIFFS–APPELLANTS, v. EUGENE J. COYLE, DEFENDANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 1, 2004—Decided February 28, 2005.

Before Judges WEFING, FALL and PAYNE.

*Theodore L. Abeles* argued the cause for appellants (*Tompkins, McGuire, Wachenfeld & Barry* attorneys; *Mr. Abeles* of counsel and on the brief and *Brian M. English* on the brief).

*Anthony P. Ambrosio* argued the cause for respondent/cross-appellant (*Mr. Ambrosio* and *Andrew J. Kyreakakis* on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

In 1993, plaintiff Sebring Associates, a real estate partnership established in 1989 to develop property in Hackensack and later, Passaic, together with partners James N. Canino and Anthony R. Palmeri, brought an action in the Chancery Division to terminate the partnership interest of Eugene J. Coyle, a physician, and for damages. Coyle crossclaimed. Following an extended bench trial before Judge Marguerite Simon, on December 23, 1999, a judgment of dissolution pursuant to *N.J.S.A.* 42:1–32(c) and (d)[1] and

---

[1] At the time of trial, New Jersey followed the Uniform Partnership Act of 1914(UPA), codified at *N.J.S.A.* 42:1–1 to –43. (The sections of the New Jersey Act are numbered in accordance with the UPA.) In 2000, the Legislature repealed these statutes and enacted *N.J.S.A.* 42:1A–1 through 56, which followed the Uniform Partnership Act of 1997 (RUPA). The provisions of the two acts are substantially similar as they relate to matters at issue in this case. For a comparison of the UPA and RUPA, *see* II *Bromberg and Ribstein on Partnership*

certain damages were awarded. Coyle's counterclaim asserting his right to maintain his partnership interest under a theory of minority oppression was dismissed.

In a written opinion issued by the court on October 22, 1999, Judge Simon found that the dissolution of the partnership [2] was justified by Coyle's failure to meet cash calls, his taping of conversations with partners and his general refusal to accept responsibility for partnership matters.[3] Judge Simon also found that there was no equity in the partnership as of the date of its dissolution in December 1992.[4] In this regard, the judge relied on an appraisal by Cushman & Wakefield as of March 19, 1993 and revised on July 16, 1993 setting the fair market value of the Hackensack property at $27,500,000 and documents in the posses-

---

§ 7 (Dissociation, Dissolution and Winding Up) (2002). We refer to the UPA as codified in New Jersey in this opinion, but note the following relevant provisions of the RUPA: *N.J.S.A.* 42:1A-24 (RUPA § 404)(partner's fiduciary duties); *N.J.S.A.* 42:1A-25 (RUPA § 405)(actions by partnership and partners); *N.J.S.A.* 42:1A-31 (RUPA § 601)(events causing partner's dissociation); *N.J.S.A.* 42:1A-32 (RUPA § 602)(wrongful dissociation; damages); and *N.J.S.A.* 42:1A-34 (RUPA § 701) (purchase of dissociated partner's interest when business is not wound up).

[2] A letter declaring the termination of Coyle's participation in the partnership was sent on June 17, 1992. However, for convenience in accounting, Judge Simon utilized December 31, 1992 as the termination date. Because that later date does not appear to have been substantially challenged in proceedings before Judge Simon, we accept it here. We find no basis for the use of the date of the entry of judgment as the date of dissolution, since the case was inactive for many years while litigation against nonparties took place.

[3] We affirmed that determination, holding more specifically that "Coyle's failure to respond to cash calls 'affect[ed] prejudicially the carrying on of [Sebring's] business,' *N.J.S.A.* 42:1-32(1)(c), and made it 'reasonably [im]practicable to carry on the [partnership] business' with him remaining a partner, *N.J.S.A.* 42:1-32(1)(d)." *Sebring Associates v. Coyle*, 347 *N.J.Super.* 414, 430, 790 A.2d 225 (App.Div.), *certif. denied*, 172 *N.J.* 355, 798 A.2d 1269 (2002).

[4] Judge Simon also found that, pursuant to paragraph 14 of the partnership agreement, Coyle's interest in the partnership had been reduced to zero as the result of the negative balance in his capital account.

sion of First Fidelity Bank that disclosed that outstanding mortgage obligations due to it aggregated between $42 and $44 million. Although Judge Simon expressed some doubt as to the accuracy of those figures, she never suggested that any equity existed in the property at that time. No one has contended that there was any equity in the Passaic property, which has been regarded as a business failure almost from the outset.

In calculating damages, Judge Simon relied upon *N.J.S.A.* 42:1–38(2), which provided that when a partnership dissolution occurs as the result of the wrongful acts of a partner and the business is continued, the departing partner has the right as against his former copartners "to have the value of his interest in the partnership, less any damages caused to his copartners by the dissolution, ascertained and paid." *N.J.S.A.* 42:1–38(2)(c)(II). The judge determined that when the termination occurred, Coyle had withdrawn from the partnership $341,640 more than he had put into it, as reflected in the negative balance in his capital account.[5] As a consequence, Judge Simon found that the partnership was entitled as cash-call damages to reimbursement in an amount required to raise Coyle's capital account balance to zero, thereby bringing his contributions and withdrawals into equipoise. Although proofs of additional cash-call damages were presented, Judge Simon did not consider them, apparently reasoning that a further damages award, when paid, would be the equivalent of a positive cash contribution by Coyle, raising his capital account above zero and, in a circular fashion, triggering a reimbursement obligation on plaintiffs' part.

Judge Simon thus awarded to Sebring $341,640 in cash-call damages plus prejudgment interest[6] of $140,121.15. *See* Decem-

---

[5] The capital accounts of Canino and Palmeri had substantial positive balances.

[6] Prejudgment interest was awarded by the court on all amounts from January 1, 2003 in accordance with the guidelines set forth in *R.* 4:42–11(a). An opinion

ber 23, 1999 judgment at ¶ 5. In addition to this amount, Judge Simon awarded damages plus prejudgment interest to Sebring that were unrelated to cash calls totaling $107,875.91 for unpaid rent for a penthouse apartment occupied by Coyle; to Canino for payroll taxes and other obligations paid for Coyle's benefit in the amount of $9,165.93; to Canino for monies loaned in the amount of $28,202.85; and to Palmeri for payroll taxes and other obligations in the amount of $51,470.21.

Coyle appealed from Judge Simon's order of judgment; plaintiffs did not. We resolved the appeal in a published opinion written by Judge Baime. *Sebring Associates v. Coyle,* 347 *N.J.Super.* 414, 790 *A.*2d 225 (App.Div.), *certif. denied,* 172 *N.J.* 355, 798 *A.*2d 1269 (2002). In his appeal, Coyle argued: (1) the Chancery Division failed to adhere to the partnership agreement in divesting his partnership interest; (2) proceeds of a $900,000 loan by Powder Mill Bank should have been considered a capital contribution by Coyle; (3) Canino and Palmeri were guilty of acts of minority oppression and should have been estopped from seeking to divest Coyle of his partnership interest; and (4) the matter should be remanded for recalculation of that interest. 347 *N.J.Super.* at 423, 790 *A.*2d 225.

We rejected all of Coyle's arguments with the exception of that related to the Powder Mill loan. In that regard, we noted that each of the partners had obtained $900,000 loans on Sebring's behalf from Powder Mill, a device necessitated by the need of Sebring for approximately three million dollars and the $900,000 limit imposed upon the bank's lending ability. Canino and Palmeri had settled their debts with Powder Mill, and each eventually was given full credit in his capital account for his $900,000 cash contribution. Coyle had not paid his obligation. However, the FDIC, which had later taken over the bank, had not filed suit against Coyle. We held that if the statute of limitations barred

by Judge Simon issued on December 23, 1999 set forth her rationale for awarding interest at that rate.

collection on the debt, the amount should be credited to Coyle's capital account, despite the default in his obligations, since the loan had benefitted Sebring. We stated:

> Under these circumstances, we believe that the interests of justice militate in favor of according Coyle the benefit of the uncollectibility of the debt. While such a result would have the effect of rewarding Coyle for his obstinance and audacity, we are convinced that it represents the most equitable result.
>
> [347 *N.J.Super.* at 433, 790 *A.*2d 225.]

However, because we could not determine from the record whether the loan was collectible, we remanded the matter so that a determination of the issue could be made. We stated further:

> The Chancery Division's disposition of this issue will have no impact on its order dissolving the partnership. Even if it later appears that Coyle has a positive balance in his capital account, that would not excuse his lack of fidelity to the partnership in refusing to respond to cash calls. The order of dissolution must stand.
>
> The judge's determination will, however, impact on the question of damages. Under *N.J.S.A.* 42:1–38(2)(c)(II), Coyle has the right to the value of his partnership interest less any damages caused to his partners by the dissolution. Judge Simon did not determine the amount of damages that flowed from Coyle's failure to respond to cash calls, but limited that category of damages to the amount needed to remove defendant's negative capital account balance. In other words, the judge did not consider amounts allegedly advanced by plaintiffs for a defaulting Coyle and paid through Sebring to Midlantic Bank because that money, if paid, would have been credited to Coyle's capital account. If Coyle's capital account is to be credited with the Powder Mill loan, leaving defendant with a positive balance, those additional damages may be considered.
>
> [*Id.* at 434, 790 *A.*2d 225.]

On remand, Judge Simon construed our instructions narrowly. Upon determining the uncollectibility of the debt to Powder Mill, she credited the $900,000 to Coyle, subtracted from it the $341,640 previously awarded as cash-call damages, and awarded Coyle damages of $558,360 plus prejudgment interest from January 1, 1993 in the amount of $229,007.24 for a total of $787,367.24. A judgment vacating paragraph five of the prior order and awarding damages to Coyle as stated was entered on May 7, 2003. Judge Simon declined to offset Coyle's award with any of the additional damages claimed by plaintiffs at trial.

# I.

Plaintiffs have appealed from Judge Simon's revised May 2003 judgment, and Coyle has cross-appealed. Our evaluation of the arguments made in this second appeal is made more difficult by the lack of an accounting,[7] the obfuscatory arguments presented on behalf of both plaintiffs and defendant, the lack of any citation to the trial record, the absence of legal support for the positions of the parties, and the mischaracterization of determinations by Judge Simon and by this court. In the interest of fostering some closure to this unnecessarily protracted litigation, we nonetheless make the determinations that follow.

At the time Coyle's interest in the partnership was terminated, that partnership was dissolved, but not wound up. *N.J.S.A.* 42:1–29 ("The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business."); *N.J.S.A.* 42:1–32 (dissolution by judgment of court). Pursuant to *N.J.S.A.* 42:1–38(2)(b), Canino and Palmeri, the partners who had not caused the dissolution wrongfully, could continue to possess partnership property so long as they paid Coyle the value of his interest less any damages recoverable as the result of the dissolution. *See N.J.S.A.* 42:1–38(2)(c)(II).[8]

---

[7] *N.J.S.A.* 42:1–43 confers upon any partner the right to an accounting of his interest in the partnership as against those continuing the business. *See also Long v. Mertz*, 21 *N.J.Super.* 401, 403, 91 *A.2d* 341 (App. Div.1952 (recognizing right); *Notch View Assoc's v. Smith*, 260 *N.J.Super.* 190, 198–99, 615 *A.2d* 676 (Law Div.1992).

[8] It is established that "a partner does not lose his right to accrued partnership profits by breach of the partnership agreement, though his share is subject to charges in final accounting. This rule is applied even when the breach is committed in bad faith." *Staszak v. Romanik*, 690 *F.2d* 578, 585 (6th Cir.1982). "The other partners are entitled to recover any damages which th[e] breach caused the partnership. But forfeiture of [the defaulting partner's] interest [i]s not a permitted sanction for the breach." *Ibid. See also Kagel v. Johnson*, 3 *N.J. Misc.* 84, 87, 127 *A.* 664 (Ch.1925) (failure of partner to contribute his full share

■ In settling Coyle's rights upon dissolution, *N.J.S.A.* 42:1–40 provided that, absent agreement to the contrary, Coyle would be entitled to his share of partnership assets (the partnership property), minus liabilities, consisting in order by which they were to be satisfied of (1) those owing to creditors other than partners; (2) those owing to partners other than for capital and profits; (3) those owing to partners in respect of capital; and (4) those owing to partners in respect to profits. *N.J.S.A.* 42:1–40(a)–(c). *See also Molineaux v. Raynolds,* 54 *N.J.Eq.* 559, 567, 35 *A.* 536 (Ch. 1896) (holding under common law. "[i]f there is a surplus, it must be divided as profits, and if there is a deficit the loss must be borne in the same ratio," and applying assets to liabilities in the same fashion as now statutorily required). When a partnership is insolvent, the claims of individual partners cannot be recognized until other claimants are paid in full. *Lawson v. Dunn,* 66 *N.J.Eq.* 90, 91, 57 *A.* 415 (Ch.1904).

■ As we have stated previously, at the time of the dissolution, the partnership's property consisted of a completed apartment tower in Hackensack, additional adjoining uncompleted projects in Hackensack and property in Passaic. In 1993, the net value of the Hackensack property was determined by Cushman & Wakefield, by deducting the indebtedness on the project from its fair market value, resulting in a negative balance of approximately $14,000,000. We find no error in the manner in which the calculation was made. *See Sorokach v. Trusewich,* 13 *N.J.* 363, 370, 99 *A.2d* 790 (1953) (adopting fair market value as the appropriate standard of valuation of partnership's machinery upon partnership dissolution), *on appeal after remand,* 35 *N.J.Super.* 86, 89, 113 *A.2d* 194 (App.Div. 1955) (discussing fair market valuation approach). There was no equity in the Passaic property.

■ In instances in which a negative equity exists in the partnership at the time of dissolution, the withdrawing partner

---

of capital only rendered him liable for damages caused by breach, creating a lien upon his share of the partnership).

cannot claim a right to return of capital or profits. *Weston v. Donnelly,* 927 *F*.2d 369, 373 (8th Cir.1991) (affirming the district court's refusal to consider withdrawing partner's capital contributions in its damage calculations when "the partnership was operating at a loss and lacked sufficient assets to satisfy the debts which must be paid before the partners may seek a return of their capital contributions."); *Kelly v. Silverwood Estates,* 127 *Idaho* 624, 903 *P*.2d 1321, 1326 (1995) (in circumstances in which there was a significant negative equity in the partnership, there was nothing payable to the partners upon dissolution).

We thus find that Judge Simon erred in granting any damages to Coyle in this case. Regardless of the amount of his actual or imputed capital contributions, he was entitled to no return upon dissolution so long as the partnership lacked equity at that time. The judgment of May 7, 2003 for Coyle in the amount of $787,367.24 is thus reversed.

## II.

In this matter, the damages to the partnership caused by Coyle were measured principally by Coyle's failure to contribute to cash calls, resulting in a negative balance in Coyle's capital account calculated to be $341,640 as of December 31, 1992. Judgment in that amount was entered on December 23, 1999, plus interest of $140,121.15 for a total of $481,761.15. An additional issue arises as to whether that damage award should be reinstated. We discuss that issue in the following sections of this opinion.

### a. *The Powder Mill Loan*

On appeal, plaintiffs argue that Coyle should not have received a credit to his capital account for the $900,000 borrowed from Powder Mill, because the debt did not become uncollectible until many years after the termination of Coyle's partnership interest. We reject this argument, finding that Sebring had use of the money throughout the period at issue. As we stated in our initial decision:

The simple and overriding fact is that the capital accounts of Canino and Palmeri were increased by $900,000 each. Because Coyle's debt was not paid, his capital account was not credited even though he personally borrowed the money, put up the requisite collateral, and invested the funds in Sebring. If, as Coyle claims, the loan is uncollectible and is credited to his capital account, that would produce a windfall for him. However, that windfall would be at the expense of the bank, not the partnership. Sebring has had actual use of the money and, if the debt is uncollectible, has no obligation to pay off Coyle's loan.

[347 *N.J.Super.* at 433, 790 *A.*2d 225.]

We thus previously determined that Coyle's capital account should be credited in an amount equal to the loan if it were found to be uncollectible, noting that even Sebring's accountant, Robert Jampol, had testified at trial that a forgiven debt should be considered capital in the accounts of the partners. *Ibid.* We adhere to that position.

However, we note that both Canino and Palmeri contributed equal amounts to the partnership as the result of their own $900,000 loans from Powder Mill, the proceeds of which were transferred to Sebring. For accounting purposes, those amounts were carried as loans on the partnership's books until 1995 and only then redenominated as capital contributions by the two remaining partners. Since we have credited Coyle's capital account with the additional $900,000 as of the date of dissolution of the partnership, for purposes of a damage assessment, we credit the accounts of Canino and Palmeri, likewise. Because the capital contributions have thus been equalized, as equity requires in the circumstances, we do not consider these amounts further for damages purposes. They cancel out each other.

b. *Cash–Call Damages*

Plaintiffs additionally argue that Judge Simon erred in failing to set off their additional cash-call damages against the positive balance in Coyle's capital account that would be created if the $900,000 attributable to the Powder Mill loan were added to that account. Although we have eliminated that loan from consideration for purposes of assessing damages, we agree with the principle that any positive balance in Coyle's capital account must

be off-set by plaintiffs' additional cash-call damages. We reject Coyle's argument that "[t]he trial court rendered a complete and definitive decision on all of plaintiffs' damages," including cash calls, in her initial decision. The most cursory examination of Judge Simon's opinion would reveal that statement to be unsupported. Plaintiffs' cash-call damage claims were artificially limited by Judge Simon in her initial judgment for the reasons that we have explained previously.[9] There is no reason for them now to be ignored, if their further consideration is warranted.

On appeal, plaintiffs argue that their economic expert at trial, Robert DiPasquale, established by review of the books and records of Sebring that in 1991, Canino had made cash-call contributions of $122,000; Palmeri had contributed $725,292.77; and Coyle had contributed $48,000. In 1992, Canino had contributed $824,500; Palmeri had contributed $567,003.93; and Coyle had contributed nothing. Thus, by not fulfilling his cash-call obligations, Coyle had deprived Sebring of $234,430.92 in 1991 and $463,834.63 in 1992, for a total of $698,265.55. Plaintiffs claim that prejudgment interest, calculated on this sum in the same fashion utilized by Judge Simon when entering the initial judgment, would increase the amount by $462,294.36 for a total of $1,160,559.92.

---

[9] Further, there were categories of damages that Judge Simon simply declined to address, finding that a determination was unnecessary in the context presented. In particular, Judge Simon did not allocate damages claimed by Sebring arising out of cash advances, made by it without contribution by Coyle, to Total Care, Inc., a corporation established to develop facilities for cardiac care and rehabilitation within the Hackensack apartment complex being developed by Sebring. Because plaintiffs have not appealed from the initial damage award, we do not address these damages, either. However, we note that RUPA § 701, cmt. 4 states:

It is not intended that the partnership's right of setoff be construed to limit the amount of the damages for the partner's wrongful dissociation and any other amounts owing to the partnership to the value of the dissociated partner's interest. Those amounts may result in a net sum due to the partnership from the dissociated partner.

See also RUPA § 602 (wrongful dissociation; damages), cmt. 4 (enumerating types of damages available).

In remand proceedings, defendant treated the levels of the partners' capital accounts as established at trial [10] (Judge Simon having rejected the opinions of Coyle's expert, Frank M. Cerreta),[11] and as affirmed on appeal. We therefore accept it here, although we do not award that amount, adhering to the principle adopted early in this litigation that damages assessed against Coyle arising from his failure to meet cash calls should be limited to the negative balance of his capital account, and considering the matters that we shall next discuss.

c. *The Midlantic Loan*

In 1988, Coyle sold his home in Englewood to Dr. Paul Rodigas (Rodigas) and his wife, Dr. Susan Fox Rodigas (Fox) for $2.2 million, taking back a $500,000 second mortgage. Thereafter, Coyle learned that Paul Rodigas had been diagnosed with a malignant brain tumor, and as a result he planned to give up his practice as a cardiac surgeon, thereby substantially diminishing his income. As we previously described the events that followed:

> Rodigas and Fox, along with Coyle, hatched a plan to establish a cardiac rehabilitation facility. Coyle arranged a presentation of the idea for Canino and Palmeri, proposing to establish a large office on the "professional floor" of Excelsior I [the first constructed of Sebring's Hackensack apartments]. Coyle recommended the

---

[10] Judge Simon stated in her opinion that "there is no dispute as to whether the records properly reflect the actual contributions of the partners. Mr. Ambrosio [Coyle's attorney] noted that he does not contest the accuracy of plaintiffs' records but does dispute how they are analyzed."

[11] As noted by the judge:

> [Cerreta] is no longer a certified public accountant as he was forced to surrender his license after entering a guilty plea in April 1995 to a charge of failure to file federal income tax returns. He explained his dereliction by noting that he had a couple of heart attacks in 1985–86 and his business closed. Yet, the incident was in 1990 and the charge was processed in '95–'96.

After reviewing inconsistencies and deficiencies in Cerreta's testimony, the court found that "Frank Cerreta was frequently unresponsive and his positions often untenable." The court generally accepted the position of plaintiffs' expert DiPasquale, except with respect to the Powder Mill loan and another matter that is not presently relevant.

plan to Canino and Palmeri, concealing the fact that Rodigas suffered from a malignant brain tumor.

[347 *N.J.Super.* at 419, 790 *A.*2d 225.]

A management company called Total Care Health Systems, Inc. was established by Coyle to provide cardiac rehabilitation services, a diet center and a woman's care unit. Sebring was required to provide "fit-up" expenses, and "[t]he three partners and Rodigas and Fox borrowed $1,400,000 from Midlantic Bank, with all five signing personal guarantees." *Id.* at 420, 903 *P.*2d 1321. Eventually, defaults on the loan occurred, and Midlantic sued on the personal guarantees. Canino, Palmeri and Coyle settled Midlantic's claims against them by agreeing to pay $300,000 each. "Although Canino and Palmeri paid their obligations in a timely manner, Coyle subsequently defaulted. Sebring itself suffered a major loss." *Ibid.*

■ In discussing damages resulting from Coyle's default on his obligations under the Midlantic settlement, we stated: "the judge did not consider amounts allegedly advanced by plaintiffs for a defaulting Coyle and paid through Sebring to Midlantic Bank because that money, if paid, would have been credited to Coyle's capital account." *Id.* at 434, 903 *P.*2d 1321. However, we then stated: "If Coyle's capital account is to be credited with the Powder Mill loan, leaving defendant with a positive balance, those additional damages may be considered." *Ibid.* On remand, Judge Simon rejected the argument of Coyle's counsel that Coyle's capital account should be credited with one-third of the $600,000 paid by Sebring on the Midlantic settlement. Finding the language that we have set forth to be contradictory, Judge Simon chose to ignore the Midlantic obligation, and to enter a judgment that took account only of Coyle's negative capital account of ($341,640), augmented by the $900,000 credit awarded for the Powder Mill loan, for a positive total of $558,360 plus interest.

We find Judge Simon's interpretation of our decision to have been in error, because she failed to recognize her obligation to determine the "damages caused to [Coyle's] partners by the

dissolution" and to consider those additional damages if, as the result of credits awarded, Coyle's capital account were found to have a positive balance.

We cannot determine on the basis of the record before us whether the $600,000 paid in settlement of Canino's and Palmeri's obligations under the settlement with Midlantic was derived from the personal funds of partners or from partnership funds, and we cannot trace how the funds were accounted for thereafter. However, for purposes of resolving this matter, we assume that the $600,000 was paid by Sebring, and that Coyle is entitled to a credit on his capital account of $200,000 as his counsel has claimed.[12] However, that amount must be set off against the far larger amount represented by the plaintiffs' cash-call damages. Thus, there is no incursion into the amount of the initial damage award set forth in paragraph 5 of the court's order of judgment of December 23, 1999. Because plaintiffs did not appeal that initial damage award, we exercise our original jurisdiction to reinstate that judgment. *R.* 2:10-5; *Gandolfi v. Town of Hammonton,* 367 *N.J.Super.* 527, 549, 843 *A.*2d 1175 (App.Div.2004); *Ladenheim v. Klein,* 330 *N.J.Super.* 219, 224, 749 *A.*2d 387 (App.Div.2000); *Yakal–Kremski v. Denville Twp. Bd. of Educ.,* 329 *N.J.Super.* 567, 579, 748 *A.*2d 642 (App.Div.2000).

We have carefully reviewed the remaining arguments of counsel, and find none to have sufficient merit to warrant discussion in a written opinion. *R.* 2:11-3(e)(1)(E).

The judgment entered by the court on May 7, 2003 is vacated and the judgment of December 23, 1999 is reinstated.

---

[12] Contrary to plaintiffs' position, Coyle waived damages only if his partnership were restored.